IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HELENA DUPONT WRIGHT, JAMES MILLS, JOSEPH WRIGHT, and T. KIMBERLY WILLIAMS, | |
| Plaintiffs/Counter-defendants, | Civil Action 1:17-cv-00286-JFB-CJB |
| vs. | |
| ELTON CORPORATION, GREGORY FIELDS, FIRST REPUBLIC TRUST COMPANY OF DELAWARE LLC, and M.C. DUPONT CLARK EMPLOYEES PENSION TRUST, | |
| Defendants/Counter-claimants/Third-party Plaintiffs, | |
| vs. | |
| JAMES B. WYETH, Solely as Executor and Personal Representative of the Estate of Phyllis M. Wyeth, MARY MILLS ABEL SMITH, CHRISTOPHER T. DUPONT, and MICHAEL DUPONT, | |
| Third-party defendants. | |

**PLAINTIFF T. KIMBERLY WILLIAMS' BRIEF IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

KANTOR & KANTOR, LLP
Elizabeth Hopkins (*pro hac vice*)
Susan L. Meter (*pro hac vice*)
Kantor & Kantor, LLP
19839 Nordhoff Street
Northridge, CA 91324
(818) 886-2525 (Telephone)
(818) 350-6272 (Facsimile)
ehopkins@kantorlaw.net
smeter@kantorlaw.net

*Attorneys for Plaintiff*
*T. Kimberly Williams*

GARY W. ABER, P.A.
Gary W. Aber (DSB #754)
704 N. King Street, Suite 200
P.O. Box 1675
Wilmington, DE 19899
(302) 472-4900 (Telephone)
(302) 472-4920 (Facsimile)
GAber@gablawde.com

*Attorneys for Plaintiff*
*T. Kimberly Williams*

RENAKER HASSELMAN SCOTT LLP
Teresa S. Renaker (*pro hac vice*)
Kirsten G. Scott *(pro hac vice)*
505 Montgomery Street, Suite 1125
San Francisco, CA 94111
(415) 653-1733 (Telephone)
(415) 727-5079 (Facsimile)
teresa@renakerhasselman.com
kirsten@renakerhasselman.com

*Attorneys for Plaintiff*
*T. Kimberly Williams*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

NATURE OF THE CASE AND STAGE OF PROCEEDINGS ................................. 2

STATEMENT OF UNDISPUTED FACTS ............................................................... 3

    I.      The Plan. ........................................................................................... 3

    II.     The Trustees. .................................................................................... 4

    III.    The Qualified Employers. ................................................................. 6

    IV.   The Trustees and Qualified Employers Have Failed to Comply with ERISA
        For More Than Four Decades. ........................................................... 7

        A.    The Trustees and Qualified Employers Were Long Aware That the
             Plan Was Likely Required to Comply With ERISA but Have Never
             Operated It in Compliance With ERISA. .................................... 8

        B.    The Trustees and Qualified Employers Caused or Allowed the Plan
             to Engage in Prohibited Investments and to Pay Impermissible
             Expenses and Unnecessary Taxes. ........................................... 11

        C.    The Trustees and Qualified Employers Have Allowed the Plan to
             Become Significantly Underfunded. ........................................... 13

SUMMARY OF THE ARGUMENT ....................................................................... 15

ARGUMENT .......................................................................................................... 16

    I.      The Trustees and Qualified Employers Are ERISA Fiduciaries. ........ 17

        A.    Both Elton Corporation and First Republic Trust Company, as
             Trustees, Are, or Were, Plan Fiduciaries. ................................. 17

        B.    Defendant Gregory Fields Is a Fiduciary Under ERISA. ........... 18

        C.    The Qualified Employers Are the Plan Administrators and Thus
             Fiduciaries Under ERISA Section 3(16), 29 U.S.C. § 1002(16). ............. 19

        D.    In Addition to Being Plan Administrators, the Qualified Employers
             Are Functional Fiduciaries of the Plan. ..................................... 19

    II.     The Trustees and Qualified Employers Have Committed Numerous
        Fiduciary Breaches and Have Engaged in Prohibited Transactions. .................... 23

    III.    The Trustees and Qualified Employers Failed to Ensure That the Plan was
        Adequately Funded. ......................................................................... 26

        A.    The Plan Is a Defined Benefit Pension Plan. ............................ 26

        B.    The Qualified Employers Are Plan Sponsors Obligated to Fund the
             Plan. ......................................................................................... 26

        C.    The Plan is Significantly Underfunded. ..................................... 27

    IV.    The Qualified Employers, as Plan Administrators, Failed to Provide Plaintiff
        Williams With Required Disclosures ................................................ 29

i

V.     The Court Should Order Statutory and Equitable Relief So That Plan
       Participants and Beneficiaries Will Receive the Pensions to Which They
       Are Entitled and to Remedy the Trustees' and Qualified Employers'
       Egregious ERISA Violations. ................................................................. 29

       A.     The Court Should Order the Employers to Properly Fund the Plan. ........ 30

       B.     The Court Should Surcharge the Trustees for the Losses the Plan
              Suffered Based on Defendants' Fiduciary Breaches and Prohibited
              Transactions. ........................................................................................ 31

       C.     The Court Should Order the Removal of First Republic as Trustee
              of the Plan, and the Appointment of an Independent Fiduciary, at
              Defendants' Cost, to Serve as Trustee and Administrator to Bring
              the Plan into Compliance With ERISA. .................................................... 33

       D.     The Court Should Order an Accounting of Plan Participants and
              Beneficiaries, the Benefits Owed to Them, and the Plan Assets. ............. 36

       E.     The Court Should Order an Appropriate Fiduciary to Promptly
              Provide Notice to All Plan Participants of the Existence of the Plan
              and Their Potential Rights Under the Plan. ............................................... 37

       F.     The Court Should Award Penalties Against the Qualified Employers
              for Their Egregious ERISA Disclosure Failures. ..................................... 38

VI.    Mrs. Williams Is Entitled to Summary Judgment as to Her Fifth Claim for
       Relief. .................................................................................................... 40

CONCLUSION ............................................................................................ 40

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Ackerman v. Warnaco, Inc.*,
    55 F.3d 117 (3d Cir. 1995) ............................................................. 38

*Amara v. CIGNA Corp.*,
    925 F. Supp. 2d 242 (D. Conn. 2012).......................................... 32

*Barker v. Ceridian Corp.*,
    122 F.3d 628 (8th Cir. 1997) ....................................................... 29

*Cent. Laborers' Pension Fund v. Heinz*,
    541 U.S. 739 (2004)....................................................................... 7

*Central States, SE & SW Areas Pension Fund v. Central Transport, Inc.*,
    472 U.S. 559 (1985)..................................................................... 27

*CIGNA Corp v. Amara*,
    563 U.S. 421 (2011)..................................................................... 32

*Colarusso v. Transcapital Fiscal Sys., Inc.*,
    227 F. Supp. 2d 243 (D.N.J. 2002) ....................................... 38, 39

*Commissioner v. Keystone Consol. Industries, Inc.*,
    508 U.S. 152 (1993)..................................................................... 26

*Daniels v. Thomas & Betts Corp.*,
    263 F.3d 66 (3d Cir. 2001) .......................................................... 39

*Delgrosso v. Spang & Co.*,
    769 F.2d 928 (3d Cir. 1985) ........................................................ 34

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
    874 F.2d 912 (2d Cir. 1989) ........................................................ 31

*DiFelice v. U.S. Airways, Inc.*,
    497 F.3d 410 (4th Cir. 2007) ....................................................... 25

*Donovan v. Bierwirth*,
    680 F.2d 263 (2d Cir. 1982) ........................................................ 23

*Donovan v. Cunningham*,
    716 F.2d 1455 (5th Cir. 1983) ............................................... 25, 32

*E. I. du Pont de Nemours & Co. v. Collins*,
    432 U.S. 46 (1977)......................................................................... 4

*Eaves v. Penn*,
  587 F.2d 453 (10th Cir. 1978) ................................................................. 32

*Edmonson v. Lincoln Nat. Life Ins. Co.*,
  725 F.3d 406 (3d Cir. 2013) .................................................................... 18

*Firestone Tire & Rubber Co. v. Bruch*,
  489 U.S. 101 (1989) ................................................................................ 33

*Gorini v. AMP Inc.*,
  94 Fed. App'x 913 (3d Cir. 2004) ........................................................... 39

*Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*,
  530 U.S. 238 (2000) ................................................................................ 24

*Henczel v. Amstar Sugar Corp., No. Civ. A*,
  90-6011, 1991 WL 153130 (E.D. Pa. Aug. 5, 1991) ............................... 39

*Hennessy v. Federal Deposit Ins. Corp.*,
  58 F.3d 908 (3d Cir. 1995) ...................................................................... 38

*Hozier v. Midwest Fasteners, Inc.*,
  908 F.2d 1155 (3d Cir. 1990) .................................................................. 29

*Hughes Aircraft v. Jacobson*,
  535 U.S. 432 (1999) ........................................................................... 26, 27

*In re Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir. 1996) ...................................................................... 23

*In the Matter of Christiana Sec. Co. E. I. Du Pont De Nemours & Co.*,
  45 S.E.C. 649, 1974 WL 161445 (Dec. 13, 1974) .................................... 4

*Jones v. UOP*,
  16 F.3d 141 (7th Cir. 1994) ...................................................................... 8

*Katsaros v. Cody*,
  744 F.2d 270 (2d Cir. 1984) .................................................................... 34

*L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*,
  634 F. Supp. 2d 290 (E.D.N.Y. 2009) ................................................. 31, 32

*Lloynd v. Hanover Foods Corp.*,
  72 F. Supp. 2d 469 (D. Del. 1999) ......................................................... 39

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996) ................................................................................ 24

*Pegram v. Herdrich*,
    530 U.S. 211 (2000)..................................................................................... 18

*Perelman v. Perelman*,
    793 F.3d 368 (3d Cir. 2015) ...................................................................... 31

*Perez v. Kwasny*,
    No. CV 14-4286, 2016 WL 521318 (E.D. Pa. Feb. 9, 2016) ................. 35

*Reich v. Compton*,
    57 F.3d 270 (3d Cir. 1995) ........................................................................ 24

*Romero v. Smith Kline Beecham*,
    309 F.3d 113 (3d Cir. 2002) ...................................................................... 39

*Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan*,
    671 F. Supp. 2d 88 (D.D.C. 2009)............................................................ 27

*Struble v. New Jersey Brewery Employees' Welfare Trust Fund*,
    732 F.2d 325 (3d Cir. 1984) ...................................................................... 33

*Sweda v. Univ. of Penn.*,
    923 F.3d 320 (3d Cir. 2019) .............................................................. 23, 25

*U.S. Steel Min. Co. v. Dist. 17, United Mine Workers of Am.*,
    897 F.2d 149 (4th Cir. 1990) .................................................................... 18

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996)............................................................................. 17, 22

## **FEDERAL STATUTES**

29 U.S.C. § 1001 ............................................................................................. 1

29 U.S.C. § 1001(b) ...................................................................................... 26

29 U.S.C. § 1001(b) ........................................................................................ 7

29 U.S.C. § 1001(c) ........................................................................................ 7

29 U.S.C. § 1002(16) ................................................................................. i, 19

29 U.S.C. § 1002(16)(A)(ii) ........................................................................ 19

29 U.S.C. § 1002(16)(B)(i) .......................................................................... 19

29 U.S.C. § 1002(16)(B)(iii)........................................................................ 19

29 U.S.C. § 1002(21)(A)............................................................................... 17

29 U.S.C. § 1002(34) ................................................................................... 26

29 U.S.C. § 1002(35) ................................................................................... 26

29 U.S.C. § 1021(f) ...................................................................................... 29

29 U.S.C. § 1023(a)(2)(A)(i) ....................................................................... 40

29 U.S.C. § 1023(a)(2)(A)(ii) ...................................................................... 40

29 U.S.C. § 1024(b)(1) ................................................................................ 29

29 U.S.C. § 1025(a)(1)(B) ........................................................................... 29

29 U.S.C. § 1031(b)(1) .................................................................................. 7

29 U.S.C. § 1053(a)(2)(A)(ii) ........................................................................ 8

29 U.S.C. § 1061(b)(1) .................................................................................. 7

29 U.S.C. § 1082 ..................................................................................... 26, 27

29 U.S.C. § 1082(b)(1) ................................................................................ 27

29 U.S.C. § 1085(b) ...................................................................................... 7

29 U.S.C. § 1102(a)(1) ................................................................................ 19

29 U.S.C. § 1102(c)(1) ................................................................................ 19

29 U.S.C. § 1103 ......................................................................................... 17

29 U.S.C. § 1106(a) .................................................................................... 24

29 U.S.C. § 1108(a) .................................................................................... 24

29 U.S.C. § 1108(b)(2) ........................................................................... 24, 25

29 U.S.C. § 1109(a) ................................................................................ 33, 34

29 U.S.C. §§ 1021-25 ................................................................................. 19

29 U.S.C. § 1132(a)(1)(B) ........................................................................... 40

29 U.S.C. § 1132(a)(3) ................................................................................ 30

29 U.S.C. § 1132(c)(1)(A) ........................................................................... 38

29 U.S.C. § 1114(a) ...................................................................................... 7

Pub. L. No. 99–514, 100 Stat 2085 (1986) .................................................. 8

**FEDERAL RULES**

Fed. R. Civ. P. 56 ............................................................................................ 17

**FEDERAL REGULATIONS**

29 C.F.R. § 2575.502c-1 ................................................................................. 38

29 C.F.R. § 4001.2 .......................................................................................... 27

**OTHER AUTHORITIES**

H.R. Rep. No. 93-1280, (1973), *reprinted in* 1974 U.S.C.C.A.N. 5038 ..................................... 26

Restatement (Second) of Trusts § 164 (1957) ............................................... 18

Restatement (Second) of Trusts, § 205 ......................................................... 32

Restatement (Second) of Trusts, § 205(c) (1959) ......................................... 32

Restatement (Second) of Trusts, § 214 ......................................................... 32

Rev. Rul. 2003-7, 2003-1 C.B. (2003)........................................................... 12

Robert W. Wood, *Money Now, Taxes Later With Prepaid Forward Contracts*, Forbes, May 29, 2021 ............................................................................................................... 12

S. Rep. No. 93–127, 1973 WL 12550 (1974) ............................................... 30

Steven J. Sacher, Ivelisse Berio LeBeau, et al.,
*Employee Benefits Law*, 4th ed. 2017 (BNA) ........................................... 1

## INTRODUCTION

This case, brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, centers around a pension plan established in 1947 by Mary Chichester duPont (the "Plan") to provide pensions to her employees and to employees of other family members, including her grandchildren. The family members, referred to in the governing trust document as "Qualified Employers," include the remaining third-party and counter defendants in this case: Katharine duPont Gahagan; Christopher duPont; Mary Mills Abel Smith; Phyllis Mills Wyeth, now represented by her estate; James P. Mills, Jr.; and Helena duPont Wright. Plaintiff T. Kimberly Williams, a Plan participant and the only remaining plaintiff in this case, seeks to bring the Plan into compliance with ERISA.

The Plan predates ERISA. Nevertheless, Mary Chichester duPont's decision to set up a trust and ongoing administrative structure to provide pensions for her family's employees was well within "the older system of employer care and responsibility that guided both employee benefit plan design and employment contract design for close to three working generations," from the 1930s to the enactment of ERISA. Steven J. Sacher, Ivelisse Berio LeBeau, et al., *Employee Benefits Law*, 4th ed. 2017 (BNA), at cvii-iii. "This notion of autonomous employer responsibility for employee economic security . . . was embraced at least in principle by the nation's business establishment for close to 60 years, spanning the Depression, World War II, and most of the Cold War period." *Id.* at cvii. In enacting ERISA, Congress did not invent pension plans. Rather, it sought to strengthen the protections for participants in existing pension plans, like the Plan at issue here. *Id.* Thus, what is unusual and surprising here is not that the Plan should be governed by ERISA, as this Court has already correctly held it is, but that the Plan has continued to operate in the shadows and that its trustees, administrators, and other fiduciaries have chosen, again and again

over more than 45 years, to simply ignore the requirements of ERISA and take no action to operate the Plan in compliance with federal law. Ms. Williams seeks summary judgment to remedy this.

## NATURE OF THE CASE AND STAGE OF PROCEEDINGS

In February 2016, Qualified Employers Mrs. Wright and Mr. Mills filed this suit against Elton Corporation and Gregory Fields in the District of Maryland. D.I. 1, ¶¶ 1, 7-10, 12. They alleged that all of the Qualified Employers, including themselves, are fiduciaries of the Plan, and they sought equitable relief to bring the Plan into compliance with ERISA. *Id.*, ¶¶ 12, 13, 25. In March 2016, Mrs. Wright and Mr. Mills filed an amended complaint, adding First Republic Trust Company ("First Republic") and the Plan as defendants. D.I. 8. The defendants moved to dismiss, including on the basis that Mrs. Wright and Mr. Mills lacked constitutional standing in that the harm they alleged was not personal to them, but rather related solely to the employees who might be entitled to pensions. D.I. 11, at 14. At the hearing, the Maryland district judge suggested that the plaintiffs "would be in a stronger position" if they added employees as plaintiffs. Ex. 30, 68:11-69:4.[1] Mrs. Wright and Mr. Mills then sought leave to amend their complaint to add two employees, Mrs. Williams and Joseph Wright, as plaintiffs, which the court granted. *Id.*, 91:2-6; D.I. 35, ¶ 1. Mrs. Williams was then employed by Mrs. Wright, and Mr. Wright, who is now deceased, was employed by Mr. Mills, both in positions and with sufficient years of service that would entitle them to pensions under the Plan. D.I. 132, at 6.

In March 2017, the District of Maryland granted in part defendants' motion to dismiss and transferred the case to this Court. D.I. 46. First Republic then counterclaimed against Mrs. Wright and Mr. Mills, and brought a third-party complaint against the other then-living Qualified Employers: Mrs. Abel Smith, Christopher duPont, Michael duPont, Mrs. Wyeth, and Mrs.

---

[1] References to "Ex." are to the exhibits to the Declaration of Teresa S. Renaker filed herewith. Citations to bates numbers omit the party identifier and leading zeroes.

Gahagan. D.I. 61, ¶ 18; D.I. 78, ¶ 18. First Republic seeks a declaratory judgment that each of the counter-defendants and third-party defendants is separately liable to fund the Plan as required by ERISA if the Plan is an ERISA plan (as the Court has concluded it is). D.I. 61, at 3-4.

In June 2019, this Court granted plaintiffs' motion for summary judgment as to their first claim, holding that the Plan is an ERISA plan and Mrs. Williams is a participant in the Plan. D.I. 132, at 14. In December 2020, the Court denied a motion by Mrs. Williams for leave to file a third amended complaint including class action allegations, holding that "the action can be properly disposed of as it is presently configured." D.I. 327, at 7. The Court noted that relief afforded in this action will apply to all Plan participants even without class certification. *Id.* at 7. In April 2021, the Court granted a motion by the parties other than Mrs. Williams to dismiss Mrs. Wright's and Mr. Mills' claims without prejudice, leaving them as counter-defendants, and leaving Mrs. Williams as the sole remaining plaintiff seeking to bring the Plan into compliance with ERISA. D.I. 374.

STATEMENT OF UNDISPUTED FACTS

## I.    The Plan.

In 1947, Mary Chichester duPont endowed a trust to provide her family's employees with pensions. Ex. 1. This became known as the M.C. duPont Pension Trust,[2] *e.g.*, Ex. 35, and is the ERISA-governed Plan at issue in this case. Mrs. duPont designated as "Qualified Employers" under the Plan herself; her children A. Felix duPont, Jr., Lydia C. duPont, and Alice duPont Mills; her daughter-in-law Allaire Crozier duPont; and her grandchildren. Ex. 1 at 2. She defined a "Pensioner" as "any domestic employee or any employee rendering secretarial, accounting or other assistance in the management of his employer's private, financial or social affairs" for a Qualified

---

[2] The Trust is sometimes referred to as the Mary Chichester duPont Clark Pension Trust.

Employer, and who was continuously employed for 10 years and reached age 65 or met certain other criteria. *Id.* She provided that a Pensioner would receive an annual benefit of 60% of his or her annual salary or wages in effect when the Pensioner met the eligibility requirements, plus an additional 1% for each year of service above 10 years. *Id.* at 2-3. She also provided for benefits for deceased Pensioners' surviving spouses and other dependents. *Id.*

Mary Chichester duPont funded the Plan with 50 shares of common stock of Christiana Securities Company. *Id.* at 10. Christiana was an investment company established in 1915 as a "receptacle for a huge block of Du Pont common stock" through which the duPont family's "dominant faction made sure that its massive holdings in Du Pont would be voted as a block." *In the Matter of Christiana Sec. Co. E. I. Du Pont De Nemours & Co.*, 45 S.E.C. 649, 1974 WL 161445 (Dec. 13, 1974). In 1977, the Supreme Court cleared the way for Christiana to merge into DuPont. *E. I. du Pont de Nemours & Co. v. Collins*, 432 U.S. 46, 57 (1977). Thus, the Plan's Christiana stock became DuPont stock. By 1999, the Plan held 112,772 shares of DuPont stock, worth about $7.4 million. Ex. 35 at 9.

The Plan expressly authorizes the Trustees to "retain any and all stocks, bonds, notes, securities and/or other property hereby or hereafter transferred to this trust" and to "accept additions to this trust by way of gift, bequest, or otherwise from any person or persons whomsoever." Ex. 1 at 6-7.

## II.   The Trustees.

After she established the Plan, Mary Chichester duPont appointed her three children – Lydia C. duPont, A. Felix duPont and Alice duPont Mills – as Trustees. Ex. 1 at 2. The Plan authorizes its Trustees to appoint their successors and to appoint successors for Trustees who die. *Id.* at 4. Lydia duPont died in 1958; the remaining Trustees, Felix duPont and Alice duPont Mills,

replaced her as Trustee with Allaire duPont, their sister-in-law and also a Qualified Employer under the Plan. Ex. 2.

In about 1980, Felix duPont and Alice duPont Mills hired Gregory Fields, who had previously worked at the DuPont Company, to be the manager of their "family office," providing financial services to their family members. Ex. 3, 4:17-6:17. In 1984, the Mills branch of the family – Alice duPont Mills and her children, Mary Mills "Mimi" Abel Smith, Phyllis Mills Wyeth, and James P. Mills, Jr. – incorporated their family office, establishing the B-103 Corporation "[t]o provide financial management, accounting and administrative services to members of the Mills family." Ex. 4 at 594. In October 1989, Alice duPont Mills and Allaire duPont resigned as Trustees at Felix duPont's suggestion, leaving Felix duPont as the sole Trustee. Ex. 5.

In about 1990, Felix duPont incorporated his family office as Elton Corporation, and employed Mr. Fields as Elton's business manager. Ex. 6, 17:16-18:13. Elton continued to serve as the family office for Felix duPont and his children, Katharine "Kitten" duPont Gahagan, Christopher duPont, and Michael duPont. *Id.*, 34:3-35:18. Felix duPont was the sole owner of Elton. *Id.*, 19:11-20:5. In July 1991, Felix duPont appointed Elton Corporation as his Co-Trustee and successor Trustee of the Plan. Ex. 7 at 2677, 2681.

Upon Felix duPont's death in 1996, Elton became the sole Trustee. Ex. 6, 18:23-19:6. Mrs. Gahagan and her brothers Christopher and Michael duPont became Elton's owners, with Mrs. Gahagan owning 60% and her brothers splitting the remaining 40%. *Id.*, 22:19-23:4. Mrs. Gahagan also became president of Elton and holds that position to this day; her brothers became vice presidents. *Id.*, 23:24-24:11. Michael duPont died in November 2019. D.I. 167. As grandchildren of Mary Chichester duPont, Mrs. Gahagan and Christopher duPont are Qualified Employers under the Plan, as was Michael duPont before his death. Ex. 6 at 22:19-23:4.

Elton served as Trustee until 2015, when First Republic Trust Company of Delaware took over. Ex. 8 at 112. First Republic was selected because an investment manager for the Plan had moved from PNC Bank to First Republic Bank, and Mrs. Gahagan wished for the Plan to follow. *Id.*; Ex. 6, 160:24-162:16. In connection with the transition to First Republic, Elton requested that each of the still living Qualified Employers execute an agreement to indemnify First Republic. Ex. 8 at 112, 2645-2672.

### III.   The Qualified Employers.

The Qualified Employers have consistently been involved in the Plan's operation. Each Qualified Employer has received the Plan's financial statements annually. Ex. 6, 26:18-28:2; Ex. 7 at 183. They are responsible for reporting employee census information to the Trustee. Ex. 6, 31:25-33:24. Each Qualified Employer is responsible for informing his or her employees about the Plan. *Id.*, 37:3-38:1, 187:9-17. Each Qualified Employer is responsible for reporting to the Trustee when an employee becomes eligible to receive a pension and for providing supporting information to the Trustee. *See id.*, 36:4-37:2; Ex. 9, 15:4-24; Ex. 7 at 634, 642; Ex. 41 at 1-2, 4-5; Ex. 8 at 39, 49. The Qualified Employers have exercised discretion in determining which of their employees would receive a pension from the Plan. Ex. 10, 12:5-14:22; Ex. 9, 29:14-30:1. And the Qualified Employers have viewed themselves as holding the power to abrogate their employees' rights to pensions under the Plan. Ex. 10, 12:5-14:22; Ex. 9, 29:14-30:1; Ex. 4 at 414, 420-26, 587.

The Qualified Employers also have weighed in on other matters of Plan administration, including whether the Plan should be brought into compliance with ERISA, whether it should be valued by an actuary and whether the Qualified Employers should contribute additional funds to the Plan, the amount of administrative expenses, the selection of a successor Trustee to replace Elton, and the disposition of the Plan's assets. Ex. 4 at 11, 16-18, 21-29, 31, 525, 587, 674-75, 679-80, 727-44, 788, 795-96, 803-06, 846-47.

**IV.    The Trustees and Qualified Employers Have Failed to Comply with ERISA For More Than Four Decades.**

In the 1960s, the IRS determined that because of the Plan's lack of vesting language, it did not qualify for tax exemption under the law then governing pensions. Ex. 11 at 76; *see id.* at 47-48, 50-54, 67. After this, Felix duPont made no further attempts to obtain a tax exemption for the Plan, but instead continued having the Plan pay federal and state income tax. *Id.* at 78, 80.

In 1974, Congress enacted ERISA to protect "the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans," "by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance." 29 U.S.C. § 1001(b), (c). The statute both established requirements for pension plan administration in ERISA (Title 29 of the U.S. Code) and mirrored many of those provisions in the Internal Revenue Code (Title 26) as prerequisites for pension plans to qualify for favorable tax treatment. *See Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 746 (2004). This "curious duplicate structure," *id.*, ensures that even if a pension plan chooses not to avail itself of favorable tax treatment, its fiduciaries must still comply with ERISA's standards for fiduciary conduct and its participants are still protected by ERISA's requirements for disclosure, vesting, funding, and so forth. ERISA's standards for reporting, disclosure and fiduciary responsibility came into effect for existing pension plans on January 1, 1975, and its standards for participation, vesting and funding became effective on January 1, 1976. 29 U.S.C. §§ 1031(b)(1), 1061(b)(1), 1114(a); *former* 29 U.S.C. § 1085(b).

After ERISA was enacted, Felix duPont's choice to forgo tax exemption in order to preserve employer control over the Plan made even less sense because ERISA's requirements

apply regardless of the plan's tax-qualified status. Nonetheless, despite a keen awareness of both the legal risks of failing to comply with ERISA and the tax advantages of compliance, it is undisputed that none of the Trustees or Qualified Employers has ever complied with ERISA's requirements with respect to the Plan – including the requirements to furnish each participant a summary plan description, to file an annual report with the Secretary of Labor, to provide a summary annual report to participants, to provide an annual pension benefit statement to each participant, to ensure that participants vested at 10 years of service before 1989 and 5 years of service after,[3] and to ensure that benefits are paid in the form of a qualified joint-and-survivor annuity or qualified pre-retirement survivor annuity. Exs. 12-18, responses 2-14.

A.     **The Trustees and Qualified Employers Were Long Aware That the Plan Was Likely Required to Comply With ERISA but Have Never Operated It in Compliance With ERISA.**

Paralyzed by in-fighting, for more than 40 years the Trustees and Qualified Employers ignored warnings from multiple law firms against flouting federal pension law and took what one attorney termed the "do-nothing" approach. Ex. 4 at 441. In April 1975, just after ERISA's enactment, Ivins, Phillips & Barker analyzed the possible impact of ERISA on the Plan. Ex. 11 at 93; Ex. 6, 124:15-25. Although the analysis has been withheld due to a claim of privilege, Ex. 11 at 93, a subsequent letter from Ivins Phillips summarizes the firm's conclusion that "there was a serious risk that the ERISA changes could be applicable to" the Plan. Ex. 4 at 576. The Trustee and Qualified Employers, however, took no action to bring the Plan into compliance. Next, in about 1983, the law firm that originally drafted the governing trust document, Richards, Layton &

---

[3] ERISA's maximum permitted vesting period, originally 10 years, changed to 5 years for any employee with an hour of service after December 31, 1988. 29 U.S.C. § 1053(a)(2)(A)(ii); *see* Pub. L. No. 99–514, 100 Stat 2085 (1986). For vesting purposes, "the employer is required to count all the employee's years of service, before and after ERISA went into effect." *Jones v. UOP*, 16 F.3d 141, 143 (7th Cir. 1994).

Finger, also approached Felix duPont about the potential impact of ERISA on the Plan. Ex. 6, 128:14-130:7. Again, Felix duPont declined to take action. *Id.*, 128:20-129:15.

In March 1988, Robert Morris, a former employee of Allaire duPont's Bohemia Stable, engaged Young, Conaway, Stargatt & Taylor to pursue a claim for benefits under the Plan. Ex. 19. Ex. 6, 136:8-137:7. An undated "Summary of Wages and Benefits Paid by Bohemia Stable for Robert Morris" includes a handwritten note stating, "Dear Bobby: As you know, you are part of the 'family' pension plan." Ex. 11 at 86. Young Conaway argued that because Mr. Morris had more than 10 years of service, he was vested under ERISA despite having terminated employment before reaching age 65. Ex. 19. The Plan and Mrs. duPont together paid Mr. Morris all or most of his demand for $115,522, which represented the then present value of his pension under the Plan plus attorneys' fees. Ex. 19 at 648-49.

Also in 1988, Mr. Fields prepared a memo to the Qualified Employers recommending that the Plan be terminated, and annuities be purchased to replace the pensions for current pensioners and employees over age 55. Ex. 4 at 727-44. However, in 1990, Ivins Phillips recommended against attempting to terminate the Plan, because "a court action would be required, which is inadvisable in view of the ERISA exposure." *Id.* at 549-50.

After Felix duPont's death in 1996, a schism developed as the Mills branch of the family pressed to bring the Plan into compliance with ERISA while the other Qualified Employers resisted. In April 1997, the Mills Qualified Employers wrote to Mrs. Gahagan, urging that the family resolve the "continuing issue of the pension trust" before "the Internal Revenue Service or an ex-employee's attorney decide[s] for us." Ex. 11 at 26. In June 1997, the Mills Qualified Employers followed up with another letter to Mrs. Gahagan, again urging that "reforming the trust to conform with current pension laws is the best solution available." Ex. 4 at 519. Mrs. Abel Smith

also wrote to Allaire duPont, complaining that "we and our employees are not enjoying the preferential tax treatment now accorded to pension funds." *Id.* at 954.

Mrs. Gahagan stonewalled, incorrectly insisting that all previous legal opinions had concluded that the Plan could not be reformed to comply with ERISA. *Id.* at 639-40; *see id.* at 674. In December 1997, Mrs. Abel Smith argued to all the Qualified Employers that "having the trust conform with current pension laws will better insure for [Grandmother]'s intentions for this fund to be fulfilled, as well as reduce the potential for problems in the years to come." Ex. 4 at 12.

In July 1998, Mr. Fields wrote to Ivins Phillips, asking how to handle inquiries from Felix duPont's employees who were ineligible for pensions under the trust document's terms due to Felix duPont's death, but who would be entitled to a pension under ERISA applied to the Plan. Ex. 11 at 3-4. Mr. Fields wrote, "Overriding this entire review is the issue of whether we fall within the ERISA rules and whether it makes good financial sense to grant these pensions and avoid legal challenges on a case by case basis." *Id.* at 4. The law firm advised that the Trustees could make payments to such employees "as the reasonable settlement of a claim in order to avoid the expense of potential litigation whose outcome is uncertain" due to the possible application of ERISA, and recommended seeking an advisory opinion from the Department of Labor regarding the Plan's ERISA status. *Id.* at 7-8.

In 2002, the Morris Nichols firm wrote to Elton concerning an employee whom Elton had determined was not eligible for a pension because he was not employed directly by a grandchild of Mary Chichester duPont, but rather by Hickory Hill Farm, which was wholly owned by Mrs. Abel Smith. Ex. 21. The firm wrote, "Although the Trust does not purport to be a [tax-]qualified plan, I think we have all recognized the likelihood that it would be governed by applicable provisions of the laws applicable to qualified plans." *Id.* The employee received his pension from the Plan. Ex. 8 at 104-05; Ex. 34 at 10.

The longer the Trustees and Qualified Employers put off addressing the issue, the worse the potential consequences described by their lawyers became. In 2002, Ivins Phillips raised the specter that the Delaware Chancery Court might "require that the trust be reformed retroactively to the 1975 effective date of ERISA," the Qualified Employers might have to "track down former employees and [make] payments to these individuals and their descendants," and the Department of Labor might "assert penalties for failing to satisfy the ERISA reporting and disclosure requirements." Ex. 4 at 442. Nonetheless, the Trustees and Qualified Employers continued to do nothing to bring the Plan into compliance with ERISA.

In 2015, prior to taking over as Trustee, First Republic requested that Elton obtain a legal opinion from the MandMarblestone Group that the Plan was not covered by ERISA. Ex. 6, 160:24-162:16.  The MandMarblestone Group obliged. *See* Ex. 37 at 981-83. However, also in 2015, Helena duPont Wright obtained an opinion from The Wagner Law Group that the Plan was governed by ERISA. Ex. 4 at 234-37.

**B.    The Trustees and Qualified Employers Caused or Allowed the Plan to Engage in Prohibited Investments and to Pay Impermissible Expenses and Unnecessary Taxes.**

Because the Plan has not complied with ERISA and the corresponding provisions of the Internal Revenue Code, it has suffered losses stemming from an avoidable tax burden that, at least since ERISA's enactment, has been nearly unheard of in the pension world. Exotic investments and improper tax-avoidance strategies, along with fiduciary self-dealing, have caused further losses to the Plan.

In June 2004, the purported but nonexistent "Board of Trustees of Elton Corporation" granted Mrs. Gahagan authority to establish an investment management and custody account with PNC Bank for the Plan. Ex. 7 at 2850. Elton managed the Plan's investments in conjunction with other family trusts. Ex. 9, 27:2-24; Ex. 7 at 2882. Mrs. Gahagan then entered into an investment

management agreement with PNC Bank, retaining the power for Elton to approve all investment transactions with the Plan assets. Ex. 7 at 2826. In October 2004, Mrs. Gahagan arranged to transfer the Plan's 112,772 shares of DuPont stock to PNC, *id.* at 2834. In March 2005, Mrs. Gahagan entered into an addendum to the investment management agreement, by which she purported to relieve PNC of its fiduciary obligation to avoid self-dealing transactions, allowing PNC to deal with Plan assets in its own interest. *Id.* at 2854-56.

In February 2005, Mrs. Gahagan executed an Investment Policy Statement for the Trust, selecting an asset allocation of 65% equity and 35% fixed income. Ex. 7 at 2892-94. But Mrs. Gahagan did not follow the Investment Policy Statement; instead, she chose unconventional and inappropriate investments for the Plan, including index call options, foreign currencies, and a partnership. *Id.* at 2882, 2884-85, 3606-08. In October and November 2004, Mrs. Gahagan committed all of the Plan's DuPont stock to a prepaid forward purchase contract with PNC, with a settlement date of January 12, 2007.[4] *Id.* at 2909-14, 2926-61. The contract specifically disclaimed any fiduciary responsibility of PNC as the purchaser of the shares. *Id.* at 2929-30. The contract represented that the Plan had total assets over $10 million. *Id.* at 2930. Then in May 2007, Mrs. Gahagan authorized PNC to invest $4.5 million, or about 75% of the Plan's assets at that time, in three foreign currency forward contracts. *Id.* at 2882. In 2008, the Plan paid $863,231 in income taxes as a result of the DuPont stock sale. Ex. 23 at 615.

In addition to taxes and investment expenses, the Plan also paid Elton for administration, in amounts ranging from $6,482 in 1999 to $24,000 in 2007. Ex. 35 at 8; Ex. 24 at 625; Ex. 23 at

---

[4] A prepaid forward contract is a device for delaying taxation on the sale of stock. *See* Rev. Rul. 2003-7, 2003-1 C.B. 363 (2003); Robert W. Wood, *Money Now, Taxes Later With Prepaid Forward Contracts*, Forbes, May 29, 2021. But delaying taxes would be entirely unnecessary if the Plan were operated in compliance with federal law, in which case it would be exempt from tax altogether.

616. Although the Plan's financial statements reported that these amounts were based on a percentage of the Plan's income, *id.*, in reality Mrs. Gahagan set the amount based on her determination of a "fair fee" to the Plan and other duPont family members and entities that used Elton's services. Ex. 6, 119:19-121:23.

Under Mrs. Gahagan's management, by 2013 the Plan's assets had declined to about $3.6 million, leading Mrs. Gahagan to request that her siblings and cousins "ceas[e] any future additions to the pension roll." Ex. 25; Ex. 6, 84:20-86:13; *see* Ex. 4 at 587.

### C.   The Trustees and Qualified Employers Have Allowed the Plan to Become Significantly Underfunded.

The Trustees and the Qualified Employers have long recognized that the Plan's assets are insufficient to meet its future benefit obligations. In 1984, Mr. Fields wrote to the Trustees "regarding the ability of the Pension Trust to meet the future needs of its beneficiaries. . . . [S]teps must soon be taken to redesign the means by which pension benefits will be made available to present and future employees of yourselves and your children." Ex. 4 at 703-04. Mr. Fields attached a list of 21 "Pensioners – Present and Potential" with their actual or projected pension amounts. Ex. 41 at 705-06.

On several occasions, Elton asked the Qualified Employers to list their employees who would potentially become eligible for pensions under the Plan. Ex. 6, 31:25-33:24. For example, in 1991, Mr. Fields requested employee information from the Qualified Employers to "give me the complete financial cost to the Trust." Ex. 4 at 788. Information on 20 employees exists from this period. Ex. 41 at 759-60. A separate 1992 list of current pensioners includes 15 people. *Id.* at 951. In 1999, Mr. Fields gathered information regarding 28 employees of the Mills side of the family, including their salaries and years of service. Ex. 38. Eighteen employees had already attained at least 5 years of service, meaning they were vested under ERISA's rules. *Id.*

In March 2000, Mr. Fields wrote to Mrs. Gahagan, reporting that the Plan's income trailed its then-current pension payments by about $20,000 annually. Ex. 11 at 9. Mr. Fields reported that there were then 13 employees "on pension," with an additional 27 projected to be added in the future. *Id.* In August 2011, the family office manager for the Mills family emailed the Ivins Phillips firm, explaining that Mrs. Wyeth was contemplating establishing a separate trust for her employees "because she recognizes that she has a lot of employees whose benefits if paid from the [Plan] would strain its ability to continue to pay those benefits for any length of time." Ex. 4 at 60.

In January 2014, an accountant for Elton compiled information on 24 current and projected pensioners, concluding that with income of 3% and no employer contributions, the Plan assets would be exhausted in 2023. Ex. 26. Varying the participants and Plan income produced results in which the Plan was projected to last through 2023, 2026, 2028, and 2029. Ex. 27 at 104; Ex. 7 at 218-19, 345-46; Ex. 41 at 995. In 2015, the Mills family office manager identified 17 additional employees who met ERISA's 5-year vesting requirement. Ex. 4 at 62.

Despite Elton's occasional efforts to collect information about potential pensioners, neither Elton nor any of the Qualified Employers maintained employee records relating to the Plan in any systematic manner. As a result, Plaintiff's expert actuary, Noor Rajah, was required to painstakingly reconstruct more than 70 years of plan administration based on interrogatory responses and hundreds of pages of documents. Ex. 28 at 3-7. Mr. Rajah compiled data for nearly 250 employees covered by the Plan. Renaker Decl., ¶ 29. After reviewing even more discovery responses, as well as data cleanup by an actuary hired by the third-party defendants, Mr. Rajah's final Plan participant count is more than 200. Ex. 29 at 10. Using established actuarial methods for valuing pension plan liabilities, Mr. Rajah has calculated the present value of the Plan's liabilities as $37 million to $38 million. Ex. 29 at 11, 23-32. Mr. Rajah recommends an additional 10% "load," or cushion, to account for poor data quality (resulting from missing information due to the

Trustees' and Qualified Employers' failure to maintain records), bringing his best estimate of the Plan's liabilities to $40.7 million to $41.8 million. *Id.* at 7; Ex. 28 at 22-23.

## SUMMARY OF THE ARGUMENT

1. All of the Trustees and Qualified Employers are ERISA fiduciaries. Elton Corporation was and First Republic is a fiduciary with respect to the Plan because they were appointed and acted as the Plan's trustees. Gregory Fields acted as a functional fiduciary with respect to the Plan in his role running Elton Corporation. The Qualified Employers are all fiduciaries under ERISA by virtue of their statutorily assigned role as the administrators of the Plan, and also because each of them functioned as fiduciaries in exercising discretionary authority over the management and administration of the Plan.

2. All of these fiduciaries breached their duties under ERISA in numerous respects in their administration and management of the Plan and its assets. They failed to tax-qualify the Plan, engaged in imprudent and impermissible investments of Plan assets and engaged in other prohibited transactions with respect to investment decisions and fees paid to trustees and attorneys. And perhaps most significantly, they failed to ensure that the Plan was properly funded to provide pensions to all Plan participants and beneficiaries entitled to them.

3. The Qualified Employers are also the Plan sponsors and, as such, have the duty under ERISA to properly fund the Plan so that the Plan can provide pensions to all qualified participants and their beneficiaries. The Qualified Employers did not come close to meeting their obligations in this respect and the Plan lacks the resources to even pay pensions for more than a few more years for the limited number of employees that the Qualified Employers have designated as eligible for pensions.

4. The Qualified Employers, as Plan administrators, are also charged by ERISA with numerous reporting and disclosure duties central to the statutory scheme. They completely failed

to meet these duties and never provided any Plan participant, including Plaintiff Williams, with important Plan documents designed to inform participants, among other things, of the Plan's funding status, and of the participants' own status and rights with respect to the Plan

5.      Given the Trustees' and Qualified Employers' severe and prolonged failures to meet the requirements of ERISA with respect to the management of the Plan and its assets, including their failure to come close to properly funding the Plan, the Court should order these parties to bring the Plan into compliance with ERISA. Among other things, the Court should order them to make good on any Plan losses resulting from imprudent and improper investments and to properly fund the Plan so as to ensure that the participants and beneficiaries who are entitled to pension benefits actually receive them.  The Court should also appoint an independent fiduciary to do an accounting, to bring the Plan into compliance with ERISA (including by tax-qualifying the Plan to avoid imprudent payment of taxes), and to manage the Plan in the future. This Court should also impose the maximum allowable penalties on the Qualified Employers for their egregious violations in failing to make required Plan disclosures to Mrs. Williams, or indeed to any of the Plan participants.

6.      Finally, Mrs. Williams is also entitled to summary judgment on her claim that she has a vested pension benefit under the Plan. There is no dispute that Mrs. Williams worked more than 5 years for a Qualified Employer as an accountant for Mrs. Wright.  She thus worked in a qualifying position for a sufficient length of time to be entitled to a pension under the Plan when she reaches the age of 65.

**ARGUMENT**

Summary judgment is proper if the evidence in the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56. No such issues exist as to Mrs. Williams's third through fifth claims and she is entitled to judgment as a matter of law on those claims.

## I.      The Trustees and Qualified Employers Are ERISA Fiduciaries.

As discussed below, each of the Trustees and Qualified Employers are or were ERISA fiduciaries with respect to the Plan, both because of their status as trustees or plan administrators as well as because of their active involvement in discretionary acts of Plan management and administration.

### A.      Both Elton Corporation and First Republic Trust Company, as Trustees, Are, or Were, Plan Fiduciaries.

ERISA Section 403 provides, in part:

> [A]ll assets of an employee benefit plan shall be held in trust by one or more trustees. Such trustee or trustees shall be either named in the trust instrument or in the plan instrument . . . or appointed by a person who is a named fiduciary, and upon acceptance of being named or appointed, the trustee or trustees shall have exclusive authority and discretion to manage and control the assets of the plan.

29 U.S.C. § 1103.

As was true before ERISA, a trustee of an ERISA plan is a fiduciary by the very nature of its position and authority. ERISA provides that a person is a "fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or has any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of the plan." 29 U.S.C. § 1002(21)(A).

Here, paragraph 9 of the Plan, and its subparagraphs, provide the Trustee with the exclusive authority and discretion to manage and control the assets of the Plan. Ex. 1 at 6-7. "The ordinary trust law understanding of fiduciary 'administration' of a trust is that to act as an administrator is to perform the duties imposed, or exercise the powers conferred, by the trust documents." *Varity*

*Corp. v. Howe*, 516 U.S. 489, 502 (1996) (citing Restatement (Second) of Trusts § 164 (1957)). Elton, as Trustee from approximately 1991 until 2015, was therefore a fiduciary under ERISA Section 403. Ex. 7 at 2677, 2681; Ex. 8 at 112. Likewise, First Republic, as the current Trustee, is an ERISA fiduciary and has been since 2015. Ex. 32, 20:17-21:5.

      **B.**      **Defendant Gregory Fields Is a Fiduciary Under ERISA.**

      Fiduciary status under ERISA is "to be broadly construed," *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 413 (3d Cir. 2013), and even the minor act of arranging for a pension plan "to continue insurance coverage" constitutes "sufficient discretionary authority respecting the administration of the plan to support the conclusion that the [plaintiff in that case] qualifie[d] as a fiduciary"). *U.S. Steel Min. Co. v. Dist. 17, United Mine Workers of Am.*, 897 F.2d 149, 152 (4th Cir. 1990). "At common law, fiduciary duties characteristically attach to decisions about managing assets and distributing property to beneficiaries." *Pegram v. Herdrich*, 530 U.S. 211, 231 (2000).

      Gregory Fields is a fiduciary under this broad functional test. Mr. Fields is the corporate secretary of Elton. Ex. 6, 17:16-18. As president of Elton, Mrs. Gahagan delegated responsibility to Mr. Fields for receiving pension benefit requests from the Qualified Employers, helping with Plan investments, and generally doing "the business like type of things" for the Plan. Ex. 9, 8:20-9:10; *see* D.I. 132 at 6. Mr. Fields analyzed the pension eligibility of employees of Elton and Felix duPont. *See* Ex. 6,  68:19-69:6, 70:24-71:11, 81:8-82:14, 83:6-11, 112:16-113:5, 113:15-114:1. In addition, Mr. Fields was active in obtaining legal opinions on whether the Plan is subject to ERISA and what options there might be for reforming the Plan or terminating the Plan. Ex. 4 at 436-43, 549-50, 551-75. And it was ultimately Mr. Fields who suggested and orchestrated the Qualified Employers signing agreements to indemnify First Republic. Ex. 6, 164:20-165:14.

### C.   The Qualified Employers Are the Plan Administrators and Thus Fiduciaries Under ERISA Section 3(16), 29 U.S.C. § 1002(16).

The Qualified Employers also are Plan fiduciaries by virtue of their status as Plan administrators. ERISA Section 402 requires every ERISA-governed plan to designate in the plan document one or more "named fiduciaries," who have the authority to control the operation and administration of the plan. 29 U.S.C. § 1102(a)(1).  These named fiduciaries often include the plan "administrator," *see* 29 U.S.C. 1102(c)(1); 29 U.S.C. § 1002(16), a person or group of persons empowered to administer the plan and charged with the responsibility for meeting ERISA's many reporting and disclosure duties. *See, e.g.,* 29 U.S.C. §§ 1021-25. If no plan administrator is named in the plan document, then the administrator is the plan "sponsor." 29 U.S.C. § 1002(16)(A)(ii). ERISA defines the plan sponsor to be the employer, or in the case of a plan established or maintained by two or more employers, then it is the group of representatives of the parties who establish or maintain the plan. 29 U.S.C. § 1002(16)(B)(i), (iii).

Here, the Plan provides pension benefits to certain employees of the Qualified Employers. These Qualified Employers include Christopher duPont, Katharine Gahagan, Mary Mills Abel-Smith, Phyllis Wyeth (now represented by the Estate of Phyllis Wyeth), James Mills, Jr., and Helena duPont Wright. Ex. 6 at 22:3-13. Because the Plan document does not provide for another Plan administrator, the Qualified Employers, as the Plan sponsors, are, by operation of law, the Plan administrators and are therefore fiduciaries of the Plan.

### D.   In Addition to Being Plan Administrators, the Qualified Employers Are Functional Fiduciaries of the Plan.

All of the Qualified Employers are also functional fiduciaries who established, maintained, ratified, and/or managed the Plan for the benefit of their domestic and other employees. For decades, these Qualified Employers discussed and met regularly to explore and consider various options with respect to management of the Plan, including issues related to ERISA, funding

options, bringing the Plan into compliance with ERISA, and possible reformation or termination of the Plan. Ex. 4 at 12, 18, 21-25, 29, 31, 58-60, 496, 519, 525, 576-77, 587, 639-40, 674, 679-80, 703-04, 727-44, 781, 788, 795-96, 803-06, 846-47, 854; Ex. 6, 26:18-28:2; Ex. 11 at 9-11; Ex. 20; Ex. 25. They exercised discretion in determining which employees would be eligible for benefits under the Plan, and they were the only people who requested initiation of benefits for employees. Ex. 4 at 3, 414-24; Ex. 6, 31:25-33:24, 36:4-38:1; Ex. 7 at 634, 642; Ex. 8 at 39, 49; Ex. 9, 15:4-24, 29:14-30:1; Ex. 10, 12:5-13:17; Ex. 21; Ex. 34 at 1-17; Ex. 41 at 1-2. When the Plan was running out of funds, Mrs. Gahagan requested that the Qualified Employers cease adding employees to the Plan, which indicates that they had and exercised discretion to determine who would be eligible for benefits under the Plan. Ex. 25. They were regularly informed of the financial state of the Plan, and they routinely requested and/or received annual accounting and financial statements. Ex. 6, 26:18-28:2, Ex. 7 at 183. They exercised fiduciary discretion to indemnify First Republic when it was appointed as successor trustee to Elton. Ex. 7 at 2646-72; Ex. 8 at 112.

Other undisputed facts also support a finding that each of the Qualified Employers is a fiduciary of the Plan. Mrs. Gahagan, as the president of Elton, had the authority to delegate the responsibility of administering the Plan, including managing investments, making eligibility decisions, determining the amount of benefit payments, paying benefits, and denying claims for benefits, and did in fact delegate these responsibilities to Mr. Fields. D.I. 132, at 6. Mrs. Gahagan "signed off on everything he did." Ex. 9, 8:20-9:10; *see* D.I. 132, at 6. As detailed above, *supra*, at 9-14, Mrs. Gahagan was involved in all of the family discussions about bringing the Plan into compliance with ERISA, funding issues, and reforming and/or terminating the Plan. In 2014, she wrote to the other Qualified Employers to explain that the Plan assets had diminished to a point that the Plan would soon be incapable of meeting what she considered the current pension obligations, and to ask that everyone cease adding employees to the Plan. Ex. 25. She not only

used her discretion to determine which employees of other Qualified Employers could participate in the Plan, she also made the decision that she would not pay any of her employees a pension under the Plan, even if they met the Plan's eligibility criteria. Ex. 9, 29:14-30:1. Mrs. Gahagan also made discretionary decisions affecting the investment of Plan assets. *See*, *supra*, at 11-13. As one of her last acts while Elton served as Trustee, she requested that the Qualified Employers sign an indemnification agreement that she personally executed, that purports to relieve First Republic of liability for the acts of Elton while Elton served as Trustee. Ex. 8 at 112; Ex. 7 at 2652-55.

Likewise, Mrs. Gahagan's brother, Christopher duPont, as Vice President of Elton, was involved in the discussions regarding the status of the Plan as an ERISA plan, funding, and whether or not to reform or terminate the Trust. Ex. 4 at 12, 703-06, 795-96, 803-06, 846-47. He was one of three "officers, fiduciaries, agents" who were authorized to give instructions to PNC on investments of the Plan assets. Ex. 7 at 2826-29, 2984. He also approved pension applications on behalf of Elton. Ex. 34 at 3, 8-9. Like Mrs. Gahagan, he also approved the indemnification of First Republic. Ex. 7 at 2652-55.

The Mills Qualified Employers, Mrs. Abel Smith, Mrs. Wyeth and Mr. Mills, all employed domestic, secretarial and other employees for their personal and financial affairs, whom they sometimes paid personally, sometimes through their respective farms, and sometimes through their family office, B-103. The Mills Qualified Employers at times tried to convince the other family members to bring the Plan into compliance with ERISA. Ex. 4 at 496, 519, 954.

Mrs. Abel Smith exercised discretion over the Plan on many occasions. In 2002, Mrs. Abel Smith argued the Plan is likely subject to ERISA, and she exercised discretion to get her long-term employee, Lee Roy Bettis, approved for benefits under the Plan. Ex. 4 at 414, 423-24; Ex. 21; Ex. 41 at 1-2. Mrs. Abel Smith requested that several of her other employees also be approved for the

pension. Ex. 34 at 10-13, 17. She also signed the agreement indemnifying First Republic. Ex. 7 at 2666-72.

Mrs. Wyeth employed domestic employees both directly and through her farm, Chadds Ford Stable. Ex. 39 (showing same address, same employer contact and telephone number). Mrs. Wyeth was also actively involved in discussions and decisions made with respect to reforming or terminating the Plan, communicated with her employees regarding the Plan, and requested that certain of her employees, whom she had determined were entitled to pension benefits under the Plan, be granted pension benefits. Ex. 4 at 12, 24, 29, 31, 57-60, 496, 519, 639-40, 679-80, 703-04, 727-44, 788, 795-96, 803-06, 846-47; Ex. 34 at 4. She also signed the agreement indemnifying First Republic. Ex. 7 at 2645-50.

As for Mr. Mills, he was one of the original employer plaintiffs who brought this suit, correctly alleging that he was both an employer and Plan administrator and therefore a fiduciary. D.I. 35, ¶ 1. Mr. Mills, both directly and through his farm, Burnt Mill Farm,[5] has employed at least two employees over the years. Ex. 10 at 12:5-10, 13:18-14:10. Mr. Mills testified that he decides which of his employees is eligible for the pension benefits under the Plan. Ex. 10, 12:5-14:22. Like the other Qualified Employers, Mr. Mills has the responsibility of communicating information about the Plan to his employees – a core fiduciary function. Ex. 6, 187:9-17. *See Varity Corp.*, 516 U.S. at 503. He also at times urged bringing the Plan into compliance with ERISA. Ex. 4 at 519.

Mrs. Wright has employed many employees over the years, both personally and through her two farms, Woodstock Farm and Unicorn Farm, to assist in her domestic, financial and personal affairs. Ex. 40 at 723-24. Mrs. Wright, along with her cousin Mr. Mills, was one of the

---

[5] In providing information to Elton regarding employees of the Mills family who might be eligible for pension benefits, Mr. Mills included both employees paid by him personally, as well as employees he paid through Burnt Mill Farm. Ex. 38.

original employer plaintiffs in this case and correctly alleged that she and Mr. Mills were plan administrators and therefore fiduciaries, as well as Qualified Employers. D.I. 35, ¶ 1. She too was involved throughout the years in the discussions and decisions related to the possibility of reforming or terminating the Plan. Ex. 4 at 12, 72, 234-37, 727-44, 795-96, 803-06, 846-47; Ex. 33. As of 1990, she had at least one former employee who was receiving a pension. Ex. 41 at 951. More recently, around April 2015, Mrs. Wright requested that her long-term employee Diane Trefry, who began working for Mrs. Wright in 1977, be approved for pension benefits. Ex. 34 at 1, 6. Mrs. Wright was also very involved in the selection of First Republic as successor trustee to Elton. Ex. 33.

## II.    The Trustees and Qualified Employers Have Committed Numerous Fiduciary Breaches and Have Engaged in Prohibited Transactions.

ERISA imposes on plan fiduciaries standards that are the "highest known to the law," *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982), standards that none of the fiduciaries in this case have come close to meeting.

With respect to investments, "a court assesses a fiduciary's performance by looking at the process rather than results, 'focusing on a fiduciary's conduct in arriving at [a] . . . decision . . . and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.'"  *Sweda v. Univ. of Penn.*, 923 F.3d 320, 329 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)) (alterations in *Sweda*). Here, the evidence demonstrates a lack of process with respect to the investment of Plan assets. Even though Elton, through Mrs. Gahagan, selected an asset allocation of 65% equity and 35% fixed income, Mrs. Gahagan did not in fact invest under this allocation. Instead, she made decisions to invest the Plan assets in risky investments, in part

to minimize taxes for which the Plan should never have been responsible in the first place, thereby depleting available funds for pension payments.

In 2004, Mrs. Gahagan authorized the Plan to enter into a forward purchase contract with PNC, committing all of the Plan's DuPont stock to the contract. Ex. 7 at 2909-14, 2926-61. In 2007, after the stock sale concluded, Mrs. Gahagan directed PNC to invest 75% of the Plan's assets, or $4.5 million, into three foreign currency forward contracts. *Id.* at 2882. These investments were imprudent and completely out of line with the Plan's stated investment policy. Furthermore, the fiduciaries breached their duties by imprudently failing to tax-qualify the Plan, a failure which, alone, caused the Plan to lose over $1 million between 1995 and 2014. Ex. 8 at 584, 596, 613.

In addition, the Plan fiduciaries caused or allowed the Plan to engage in transactions prohibited under ERISA Section 406(a), 29 U.S.C. § 1106(a). Section 406 prohibits specified transactions between a plan and certain interested parties, referred to in the statute as "parties in interest," because such transactions may pose "a special risk of plan underfunding because they are 'transactions' with plan insiders." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996); *see also Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241-42 (2000); *Reich v. Compton*, 57 F.3d 270, 275 (3d Cir. 1995). ERISA Section 408 provides for certain exemptions from the prohibited transactions rules, including for contracts between the plan and a party in interest, provided that no more than reasonable compensation is paid, 29 U.S.C. § 1108(b)(2), and when the Department of Labor issues an individual exemption. *Id.* § 1108(a).

Here, the administrative fees paid to both Elton and First Republic are in excess of reasonable compensation. In determining whether the Plan is paying reasonable compensation, courts look to the process undertaken by the fiduciary. "A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid

misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions.'[A] pure heart and an empty head are not enough.'" *Sweda*, 923 F.3d at 329 (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007) (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)). There is no evidence that there was any process undertaken to evaluate the reasonableness of the compensation paid to Elton for its services to the Plan, for PNC's services to the Plan or for First Republic's services to the Plan. Ex. 32, 23:2-24:15. For Elton fees, Mrs. Gahagan simply decided what she thought would be a "fair fee" without any determination of the work effort involved or the cost for comparable service by another service provider. Ex. 6, 119:19-120:16. With regard to First Republic, Elton and the Qualified Employers chose it to be the successor Trustee despite it being the highest-cost service provider proposal that they received. Ex. 4 at 162-165. No reason was given by First Republic for its higher fees, such as providing additional services that were not offered by the other service providers. Because there is no evidence that the fiduciaries used any process to determine whether the Plan fees were reasonable, they caused the Plan to engage in prohibited transactions that are not exempt under 408(b)(2).

The Plan also engaged in a prohibited transaction by investing more than permissible amounts in foreign currency transactions. Prohibited Transaction Exemption (PTE) 98-54 provides that no more than $300,000 of pension funds may be invested in foreign currency transactions. 63 Fed. Reg. 63503 (Nov. 13, 1998). On May 17, 2007, Mrs. Gahagan authorized the Plan to invest 75% of its portfolio in three foreign currency transactions in the amount of $4.5 million, or $4.2 million above the permissible amount. Ex. 36 at 136, 152.

Collectively, the Plan fiduciaries caused, failed to prevent, and failed to rectify these imprudent investments and prohibited transactions. They are therefore jointly and severally liable for the resulting millions of dollars in losses to the Plan.

III.   **The Trustees and Qualified Employers Failed to Ensure That the Plan was Adequately Funded.**

A.   **The Plan Is a Defined Benefit Pension Plan.**

ERISA governs two basic types of pension plans: individual account plans and defined benefit plans. The statute defines "individual account plan" (also called a "defined contribution plan") s "a pension plan which provides for an individual account for each participant and for benefits based solely on the amount contributed to the participant's account," and any income or forfeitures attributed to that account. 29 U.S.C. § 1002(34). In turn, ERISA defines "defined benefit plan" to mean "a pension plan other than an individual account plan," subject to one narrow exception that does not apply to this case. *Id.* § 1002(35). *See also Hughes Aircraft v. Jacobson*, 535 U.S. 432, 439 (1999) (a defined benefit plan "consists of a general pool of assets rather than individual dedicated accounts").  Thus, a defined benefit plan "as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment." *Commissioner v. Keystone Consol. Industries, Inc.,* 508 U.S. 152, 154 (1993).

The Plan at issue here does not provide for an individual account for each participant, Ex. 6, 90:16-91:6, and it provides for a fixed periodic payment of pension benefits calculated as a percentage of salary. Ex. 1 at 2; Ex. 8 at 1-17. There can thus be no real dispute that the Plan is a defined benefit plan.

B.   **The Qualified Employers Are Plan Sponsors Obligated to Fund the Plan.**

Consistent with its fundamental purpose of ensuring the "financial soundness" of employee benefit plans, 29 U.S.C. § 1001(b), ERISA contains robust funding requirements for defined benefit pension plans designed to ensure that such plans will have sufficient assets to pay the promised benefits to participants when they retire. 29 U.S.C. § 1082; *see also* H.R. Rep. No. 93-1280, 2d Sess., at 283 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5038 (stating Congress' intent to impose minimum funding rules). ERISA contains a narrow set of exceptions

to these plan funding obligations, none of which apply to this Plan. Ensuring adequate funding of pension plans was "one of the principal congressional concerns motivating the passage of the Act." *Central States, SE & SW Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 580 (1985).

ERISA Section 302 requires defined benefit pension plans to meet the statute's specified minimum funding requirements. 29 U.S.C. § 1082. The sponsoring employer or employers are responsible for making the required contributions. *Id.* § 1082(b)(1). *See Hughes Aircraft*, 525 U.S. at 440 (noting "the employer's obligation to make up any shortfall"). Here, those employers are the Qualified Employers under the express provisions of the Plan document.[6]

### C.    The Plan is Significantly Underfunded.

The Trustees and Qualified Employers are well aware that the Plan does not have sufficient assets to pay even the individuals currently receiving pensions, let alone the additional employees who are or might be entitled to pensions in the future. Ex. 25. Although the Qualified Employers have been discussing the Plan's underfunding for decades, Ex. 4 at 703-04, 735; Ex. 11 at 9; Ex. 25; Ex. 31; Ex. 38, none of them have stepped up to add any funds to meet the Plan's pension obligations. Ex. 25 at 7; Ex. 6, 91:16-92:11. Indeed, no one ever even attempted to compile a complete list of Plan participants or to quantify the Plan's liability until Mr. Rajah did so earlier this year.

Mr. Rajah is well qualified to determine funding liability. He holds a bachelor's degree in Actuarial Science and has over two decades of experience working in the field of actuarial science,

---

[6] Given "the availability of all plan assets to pay benefits to any participant or beneficiary," the Plan is probably best seen as a multiple-employer plan rather than an aggregate of single-employer plans. *See Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan*, 671 F. Supp. 2d 88, 101 (D.D.C. 2009) (holding that PBGC did not abuse its discretion in determining that plan maintained by seven employers was multiple-employer plan, not aggregate of single-employer plans)). *See also* 29 C.F.R. § 4001.2 ("Multiple employer plan means a single-employer plan maintained by two or more contributing sponsors that are not members of the same controlled group, under which all plan assets are available to pay benefits to all plan participants and beneficiaries.").

with a focus on pension plans. Ex. 28 at 1. He has worked for some of the largest employee benefit consultant firms in the country, including Towers Perrin, Hewitt Associates, and Deloitte & Touche on all aspects of defined benefit plan design, finding and management. *Id.* at 2.

Mr. Rajah's calculation of the Plan's liabilities is reliable because it is based primarily on the data provided in discovery and, in particular, by the Qualified Employers, as being full and complete to the best of their knowledge, and on data provided by Plaintiff Williams, who was Mrs. Wright's long-time accountant. Mr. Rajah also used reasonable assumptions where data was missing and, to the extent the opposing expert was able to clarify any of the data and Mr. Rajah found those clarifications to be reasonable, he updated his data and recalculated the funding liability. Ex. 29 at 2-3.  Mr. Rajah expects the calculation of the funding liability to be an iterative process, as is always the case with an ongoing defined benefit Plan, where a plan's liabilities and any funding shortfalls are updated if and when additional data is received. *Id.* at 15-16.

Mr. Rajah's reports establish that there are more than 200 known Plan participants with a total liability of between $40.7 million to $41.8 million.[7] Ex. 28 at 10. As of December 31, 2020, the total account balance for the Plan assets held at First Republic was $2,911,076.31, leaving a shortfall of over $37 million. The Qualified Employers must make contributions to the Plan sufficient to pay the benefits currently owed and the benefits that will be owed in the future. And the Trustee Defendants are also responsible for this shortfall because their own breaches allowed the underfunding to happen.

---

[7] Compare this number, which likely still undercounts Plan participants, to Elton's projection of just 24 current and expected pensioners showing the Trust running out of funds and a deficit of $3.6 million by 2028. Ex. 6, 44:7-45:16; Ex. 25. This projection did not include many employees who are eligible under ERISA requirements, such as 5-year vesting.

IV.    **The Qualified Employers, as Plan Administrators, Failed to Provide Plaintiff Williams With Required Disclosures.**

The reporting and disclosure requirements of ERISA are designed "to ensure that the individual participant knows exactly where he stands with respect to the plan and to enable employees to police their plans." *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1170 (3d Cir. 1990). For example, the administrator of an ERISA plan is required to provide each participant with a summary plan description within 90 days of when he or she becomes a participant in the plan, and at least every 5 years thereafter if there are any modifications to the plan, and if not, then at least every 10 years. 29 U.S.C. § 1024(b)(1). In addition, the administrator of a defined benefit plan such as the Plan at issue here must provide a plan funding notice to each participant on an annual basis, 29 U.S.C. § 1021(f), and it must provide pension benefit statements to participants at least every three years. 29 U.S.C. § 1025(a)(1)(B). Adequate disclosure to participants is "one of ERISA's major purposes." *Barker v. Ceridian Corp.*, 122 F.3d 628, 633 (8th Cir. 1997).

As this Court determined, Plaintiff Williams is a Plan participant. D.I. 132, p. 14. Moreover, as discussed above, *supra*, at 26-27, the Qualified Employers are the Plan administrators who are charged with disclosure duties. Yet admittedly, neither they nor the Trustees have ever provided Plaintiff Williams or other Plan participants with summary plan descriptions, summary annual reports or pension benefit statements. Exs. 12-18, responses 2-14. The Qualified Employers have thus repeatedly violated ERISA by utterly failing to comply with ERISA's critically important disclosure requirements.

V.    **The Court Should Order Statutory and Equitable Relief So That Plan Participants and Beneficiaries Will Receive the Pensions to Which They Are Entitled and to Remedy the Trustees' and Qualified Employers' Egregious ERISA Violations.**

To adequately remedy the substantial and long-standing ERISA violations at issue in this case, the Court should award multiple forms of injunctive and declaratory relief, as well as

29

statutory penalties, as discussed below. The broad relief provided in ERISA Section 502(a)(3) includes an order "to enjoin any act or practice which violates any provision of this title or the terms of the plan" or "other appropriate equitable relief . . . to redress such violations or . . . to enforce the terms of ERISA or the plan." 29 U.S.C. § 1132(a)(3).

The injunctive and declaratory relief requested by Mrs. Williams will ensure that the Plan is adequately funded so that all Plan participants and beneficiaries will receive the benefits owed to them; that the Plan is finally brought into compliance with ERISA; that Plan participants are located and informed of their rights under the Plan, since many may not even be aware of the existence of or their rights under the Plan; and that the parties who violated ERISA are held responsible for the costs involved with fixing their breaches. In addition, the requested statutory penalties are appropriate to remedy the parties' egregious notice and disclosure violations, and to deter such violations in the future.

### A.   The Court Should Order the Employers to Properly Fund the Plan.

The Court should order that the Qualified Employers adequately fund the Plan to pay the anticipated benefits as calculated by Plaintiff's expert. In enacting ERISA's minimum funding requirements, Congress sought to protect employees from the inequity of underfunded employee benefit plans that are at risk of being unable to deliver on promised benefits. *S. Rep. No. 93–127*, 1973 WL 12550, at 4845-46 (1974) (A "major issue in private pension plans relates to the adequacy of plan funding. . . . [¶] The Promise and commitment of a pension can be fulfilled only when funds are available to pay the employee participant what is owed to him. Without adequate funding, a promise of a pension . . . may be illusory and empty."). It is the obligation of employers that sponsor or maintain ERISA pension plans to adequately fund the plan.

Where employers fail to make the necessary contributions to adequately fund a pension plan, a court may order that the employers make the contributions necessary to fund the plan. *See, e.g.*, *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*, 634 F. Supp. 2d 290, 312 (E.D.N.Y. 2009), *aff'd*, 710 F.3d 57, 69 (2d Cir. 2013). As the Third Circuit has held, under ERISA, "an employer is required to contribute to a plan whenever the plan's liabilities exceed its assets." *Perelman v. Perelman*, 793 F.3d 368, 374 (3d Cir. 2015).

Thus, the Court should order the Qualified Employers to fund the Plan to cover the present estimated liabilities of a maximum of $41.8 million as set forth in Plaintiff Williams' expert reports. Ex. 29 at 11. Because the total account balance for the Plan assets held at First Republic of December 31, 2020, was $2,911,076, leaving a shortfall of over $38,888,924, that is the amount this Court should order the Qualified Employers to pay.

### B.   The Court Should Surcharge the Trustees for the Losses the Plan Suffered Based on Defendants' Fiduciary Breaches and Prohibited Transactions.

The Court also can surcharge the Defendants for the losses the Plan suffered as a result of their breaches of fiduciary duty, including their failure to ensure adequate funding of the Plan, and to remedy their prohibited transactions. As trustees of the Plan, Defendants "had a fiduciary duty to act to ensure that the Plan received all the funds to which it is entitled from the [Employers]" in order to adequately fund the Plan. *See L.I. Head Start*, 634 F. Supp. 2d at 312; *see also Diduck v. Kaszycki & Sons Contractors, Inc.,* 874 F.2d 912, 916 (2d Cir. 1989) ("trustees have a fiduciary duty to act to ensure that a plan receives all funds to which it is entitled so that those funds can be used on behalf of participants and beneficiaries") (internal quotation marks omitted). A plan trustee or other fiduciary "breach[es] its fiduciary duty to administer the Plan solely in the interest of its participants" where it "fail[s] to enforce the [contributing employers'] obligations to adequately fund the Plan, rendering those fiduciaries liable for make-whole relief. *See L.I. Head Start*, 634 F.

Supp. 2d at 312, 313.  Thus, both the Trustee Defendants, Elton and First Republic, and the Qualified Employers, all of whom were plan sponsors with funding obligations as well as Plan Administrators and functional fiduciaries, breached their fiduciary duties to act under ERISA's strict duties of prudence and loyalty in failing to properly fund the Plan. And all should be held liable for the approximately $38,888,924 of underfunding.

In addition, "trust law provides for broad and flexible equitable remedies in cases involving breaches of fiduciary duty. In addition to specific remedies for recovery of profits obtained by fiduciaries by use of plan assets, trust law provides the alternative remedy of restoring plan participants to the position in which they would have occupied but for the breach of trust." *Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir. 1978) (citing Restatement (Second) of Trusts, § 205, Comment a). Likewise, "the court has a duty to enforce the remedy which is most advantageous to the participants and most conducive to effectuating the purposes of the trust." *Id*. (citing Restatement (Second) of Trusts, § 214). *See also Donovan,* 754 F.2d at 1056 (quoting Restatement (Second) of Trusts § 205(c) (1959) (finding ERISA requires a breaching fiduciary to restore a plan to the position it would have been in but for that fiduciary's unlawful conduct).

As the Supreme Court held in *CIGNA Corp. v. Amara*, surcharge can take the form of "monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment."  563 U.S. 421,  441 (2011). It is an appropriate remedy "for loss, destruction, or diminution in value of the trust property if [the trustee] failed to exercise the requisite skill and care" required of the trustee under the law. *Amara v. CIGNA Corp.*, 925 F. Supp. 2d 242, 255 (D. Conn. 2012). Here, the fiduciaries caused diminution of the Plan assets, including by failing to operate the Plan as an ERISA plan and by failing to collect funds from the Employers as necessary to ensure that the Plan is adequately funded. Surcharge for a breaching fiduciary is appropriate regardless of whether the fiduciary has personally profited from the breach. *Id.; see*

*also* ERISA § 409(a), 29 U.S.C. § 1109(a) ("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach"). Generally, liability of fiduciaries under ERISA is joint and several. *Struble v. New Jersey Brewery Employees' Welfare Trust Fund,* 732 F.2d 325, 332 (3d Cir. 1984), *abrogated on other grounds, Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989).

Defendants have breached their fiduciary duties owed to Mrs. Williams and the other Plan participants and beneficiaries, including but not limited to the following: (a) failing to treat the Plan as an ERISA plan for multiple decades; (b) failing to require the Qualified Employers to adequately fund the Plan as required by ERISA; (c) failing to tax-qualify the Plan, thereby paying over a million dollars in taxes from Plan assets, which are costs that the Plan should not have incurred; and (d) engaging in prohibited transactions, as discussed in Section II above.

Thus, the Court can and should surcharge Defendants, as breaching fiduciaries, for the underfunding of the Plan, and additionally for the amount of any losses suffered by the Plan or the Plan participants as a result of their fiduciary breaches and the prohibited transactions in which they engaged.

### C. The Court Should Order the Removal of First Republic as Trustee of the Plan, and the Appointment of an Independent Fiduciary, at Defendants' Cost, to Serve as Trustee and Administrator to Bring the Plan into Compliance With ERISA.

The Court should order the removal of First Republic as Trustee of the Plan, and appoint Mrs. Williams' counsel to assist in the selection of an independent fiduciary. Section 409 of ERISA subjects plan administrators who breach their obligations to "such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. §

1109(a). A federal court enforcing fiduciary obligations is "thus given broad equitable powers to implement its remedial decrees." *Delgrosso v. Spang & Co.*, 769 F.2d 928, 937 (3d Cir. 1985). "Removal and replacement of a [plan] administrator under ERISA has been found appropriate where the administrator has been in substantial violation of his fiduciary duties," such as substantial failures to follow ERISA or plan term. *Id.* (citing *Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir. 1984)).

Given the many decades of substantial failures by the Trustees and Qualified Employers to operate the Plan in compliance with ERISA, this Court should appoint an independent plan administrator to bring the plan into compliance with ERISA, and also to ensure its prudent, loyal and ERISA-compliant operation going forward. *See Delgrosso*, 769 F.2d at 938. First Republic has been in substantial violation of its fiduciary duties at all times since it was appointed as trustee of the Plan, and  has done absolutely nothing to bring the Plan into compliance with ERISA even since the Court found that it is governed by ERISA more than two years ago. In fact, First Republic claims that it does not possess the skills or experience to bring the Plan into compliance with ERISA. Ex. 32, 32:5-33:4. The Court should order counsel for Mrs. Williams to assist in the selection of an independent Plan administrator. *See Degrosso*, 769 F.2d at 939 (directing the district court to "appoint a representative for the vested participants to represent them in the selection of an independent Plan administrator; and… under appropriate procedures, appoint an independent administrator of the Plan in the place of [the then-current plan administrator]"). The independent fiduciary of the Plan can then take the steps necessary to finally bring the Plan into compliance with ERISA, including, but not limited to: (1) revising Plan terms to comply with ERISA; (2) taking further steps to identify all Plan participants and their beneficiaries; (3) ensuring that the Plan is properly funded on a yearly basis on order to meet its ongoing pension obligations; (4) ensuring required notices and disclosures are sent to participants and filed with the Department

of Labor; (5) tax-qualifying the Plan; (6) paying any fees and penalties assessed by the Pension Benefit Guarantee Corporation ("PBGC"); (7) paying any penalties the Department of Labor or the Internal Revenue Service may assess; (8) establishing a claim and appeal process; and (9) ensuring that Plan participants and beneficiaries are provided past-due and future benefits to which they are entitled.

In addition, the Court should order that the Defendants and Qualified Employers bear the costs of the appointment of the independent fiduciary as well as the costs of that fiduciary's work to bring the Plan into compliance with ERISA. *See Sec'y U.S. Dep't of Lab. v. Koresko*, 646 F. App'x 230, 246 (3d Cir. 2016); *see also Perez v. Kwasny*, No. CV 14-4286, 2016 WL 521318, at *1 (E.D. Pa. Feb. 9, 2016) ("The independent fiduciary shall receive reasonable compensation for the performance of its duties, together with costs reasonably and necessarily incurred. Upon court approval, the compensation and expenses of the independent fiduciary shall be paid from the Plan's assets, but Defendant . . . shall reimburse the Plan for the cost of the independent fiduciary"). This is appropriate here because the vast majority of the independent fiduciary's work, and the costs associated with this work, will be a direct result of the Defendants' and Qualified Employers' many years of failing to administer the Plan in compliance with ERISA. The Court should retain jurisdiction over this case in order to enforce compliance with the order and to calculate the costs Defendants will owe to reimburse the Plan for paying the independent fiduciary for these necessary acts to remedy their failure to comply with ERISA to date. *See Koresko*, 646 F. App'x at 246.

In the alternative, should the Court decide *not* to order replacement of First Republic as the Trustee, the Court should order that First Republic immediately bring the Plan into compliance with ERISA. This order should include, but is not limited to, the steps listed above. Again, the Court should retain jurisdiction over this case in order to enforce compliance with this order.

**D.** **The Court Should Order an Accounting of Plan Participants and Beneficiaries, the Benefits Owed to Them, and the Plan Assets.**

The Court should order the Defendants and Qualified Employers, or an independent fiduciary if appointed, to engage in an accounting to determine who the Plan participants and beneficiaries are, what benefits owed to them, and whether the Plan assets are sufficient to meet its projected liabilities. As discussed above, they should start with the compilation of Plan participant data created by Plaintiff's expert Noor Rajah, which is not only reliable, as discussed above in Section III C., but is in fact the *only* comprehensive compilation of Plan participant and benefit data that has ever been put together for this Plan. As Mr. Rajah explained, the data is meant to be updated as additional information becomes available. The Court should order that Defendants, or the independent fiduciary if appointed, take further steps to improve this data as much as possible, for example, by contacting Plan participants to see if they have missing data that the Qualified Employers failed to maintain, such as exact years of service for the Qualified Employers or salary information.

The Court should also order that Defendants and Qualified Employers, or an independent fiduciary if appointed, compile up-to-date contact information for all Plan participants and beneficiaries. Because of the Defendants' and the Qualified Employers' failure to maintain adequate records of Plan participants for multiple decades, the contact information for a number of participants will likely be missing or outdated. This will not only interfere with participants receiving the benefits, ERISA-required notices and disclosures they are owed, but also with the Plan administrators being able to improve the benefit liabilities data based on documents and information that the Plan participants may have.

The Court should order the Plan fiduciary tasked with accounting for all the participants to utilize the Department of Labor's "Missing Participants – Best Practices for Pension Plans"

guidance to locate as many Plan participants as possible. This guidance recommends steps including: (1) sending certified letters to last-known addresses of participants and asking for updated contact information; (2) using last-known phone numbers and email addresses to attempt to obtain updated contact information; (3) checking employer records for participant, beneficiary and next of kin/emergency contact information and contacting them to request updated contact information; and (4) using public record databases, commercial locators and social media to locate individuals. https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/retirement/missing-participants-guidance/best-practices-for-pension-plans. And the Court again should require that the Defendants and the Qualified Employers bear the costs of this work, since it is their breaches of fiduciary duty that will require this undertaking.

### E.    The Court Should Order an Appropriate Fiduciary to Promptly Provide Notice to All Plan Participants of the Existence of the Plan and Their Potential Rights Under the Plan.

The Court should order the Defendants and Qualified Employers, or an independent fiduciary if appointed, to immediately provide notice to all Plan participants of the existence of the Plan and their rights thereunder. Here, given the Trustees' and Qualified Employers' failure to comply with any of these ERISA notice and disclosure requirements since ERISA was enacted more than four decades ago, Plan participants and beneficiaries may not be aware of the existence of the Plan or their rights thereunder. Therefore, the Court should order an appropriate fiduciary to promptly provide notice to all Plan participants as to the existence of the Plan and their potential rights under the Plan. Of course, going forward the Plan administrator or administrators should also ensure that all ERISA notice and disclosure requirements are met; however, given that it may take some time to appoint an independent fiduciary, bring the Plan into compliance with ERISA, and issue the disclosures required under ERISA, the Court should order an immediate notice to go out to at least inform the known Plan participants and beneficiaries, as identified in the report of

Plaintiff's Expert, of the existence of the Plan and their potential rights under the Plan. Again, the Court should Order that the Trustees and Qualified Employers pay all costs, fees and expenses of providing this notice, given that this remedy is necessary to fix their years of breaches as Plan fiduciaries.

F.     **The Court Should Award Penalties Against the Qualified Employers for Their Egregious ERISA Disclosure Failures.**

The Court should also award penalties at the maximum permitted amount to Plaintiff for the Qualified Employers' complete failure, as Plan administrators to comply with ERISA's notice and disclosure requirements. Where a plan administrator fails to provide pension benefit statements to participants or annual plan funding notices as required by ERISA, the court has discretion to award up to $110 per day per incident from the date of each such failure. ERISA Section 502(c)(1)(A), 29 U.S.C. § 1132(c)(1)(A) (authorizing penalty of $100 per day); 29 C.F.R. § 2575.502c-1 (increasing the penalty under ERISA Section 502(c) to $110 per day). In addition, where "a plan administrator fails to provide a plan participant with information ERISA requires the plan administrator to automatically furnish," such as a summary plan description and a summary annual report, "and there are no specific penalty provisions for such failure, pursuant to 29 U.S.C. § 1132(a)(3), a court may impose any appropriate equitable relief, including penalties under 29 U.S.C. § 1132(c)(1)(B)." *Colarusso v. Transcapital Fiscal Sys., Inc.*, 227 F. Supp. 2d 243, 260 (D.N.J. 2002); *see also Ackerman v. Warnaco, Inc.,* 55 F.3d 117, 124 (3d Cir. 1995) (stating that penalties under ERISA Section 502(c)(1)(B) may be applied to ERISA Section 104(b)(1) violations).

A court has discretion with regard to both whether to award penalties under Section 502(c), and the amount of any such penalties. *Hennessy v. Federal Deposit Ins. Corp.,* 58 F.3d 908, 924 (3d Cir. 1995). In making these determinations, the 5 factors most commonly considered by courts

are: "(1) bad faith or intentional conduct of the plan administrator, (2) length of delay, (3) number of requests made, (4) documents withheld, and (5) prejudice to the participant." *Gorini v. AMP Inc.*, 94 Fed. App'x 913, 919-920 (3d Cir. 2004) (citing *Romero v. Smith Kline Beecham,* 309 F.3d 113, 120 (3d Cir. 2002)). Section 502(c) penalties are "designed more to punish the intransigent administrator and to teach ERISA fiduciaries a needed lesson than to compensate the plan participant for actual loss. Thus, bad faith in failing to provide required information, while not dispositive, is, for many courts, an important consideration in deciding whether to impose penalties." *Colarusso*, 227 F. Supp. 2d at 261; *see also Lloynd v. Hanover Foods Corp.*, 72 F. Supp. 2d 469, 479-80 (D. Del. 1999) ("The purpose of ERISA's penalty provision is to induce compliance with statutory notification requirements and to punish non-compliance.")

Thus, in *Daniels v. Thomas & Betts Corp.,* 263 F.3d 66 (3d Cir. 2001), the Third Circuit upheld the district court's imposition of a $100.00 per day penalty where the administrator's failure persisted over an extended period of time, and where there was no indication that this was an administrative mistake. Likewise, in *Gorini v. AMP Inc.*, 94 F. App'x 913, 917, 919-20 (3d Cir. 2004), the Court upheld an assessment of $160,780 in penalties for a plan administrator's failure to provide four separate plan-related documents, including an SPD, where the evidence demonstrated a "pattern of conscious choices to decline to disclose" and "recalcitrance" in providing documents to which the plaintiff was entitled under ERISA. *See also Henczel v. Amstar Sugar Corp.*, No. Civ. A. 90-6011, 1991 WL 153130, at *5 (E.D. Pa. Aug. 5, 1991) (awarding $100/day for administrator's failure to provide plan materials).

Here, the Qualified Employers, as Plan administrators, are liable to Mrs. Williams for their failure to provide: (1) an SPD upon commencement of her employment in 2000 and at least every 10 years thereafter; (2) pension benefit statements every three years; (3) annual plan funding notices every year; and (4) summary annual reports every year. As set forth in the spreadsheet

39

prepared by counsel and attached as Exhibit 22 to the Renaker Declaration, imposing a penalty of $110 per day for each failure to provide a document on the schedule imposed by the statute, adds up to $22,524,000 in penalties. Ex. 22 at 2. A more conservative calculation of $110 per day from the first failure in each document category adds up to $3,252,150 in penalties. *Id.* at 3.

A maximum award of penalties is appropriate in this case given, among other factors, the Plan administrators' blatant disregard of multiple warnings that this Plan is covered by ERISA; their failure to act in the best interests of not just Mrs. Williams but all Plan participants by informing them of the Plan and bringing this Plan into compliance with ERISA; the length of the delay; the prejudice to Mrs. Williams, including having to hire counsel and pursue multiple years of litigation to assert her rights under the Plan; and the number of documents withheld.

## VI.    Mrs. Williams Is Entitled to Summary Judgment as to Her Fifth Claim for Relief.

Mrs. Williams's fifth claim for relief seeks clarification of her right to future Plan benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). It is undisputed that Mrs. Williams – who worked for approximately 18 years as an accountant for Mrs. Wright – has more than 5 years of service for a Qualified Employer in a position rendering "secretarial, accounting, or other assistance in the management of [her] employer's private, financial, or social affairs." Ex. 40 at 724; *see* Ex. 1 at 2; 29 U.S.C. 1023(a)(2)(A)(i), (ii) (5-year vesting). Therefore, the Court should grant summary judgment that Mrs. Williams has a vested benefit under the Plan.

**CONCLUSION**

There are no genuine issues of material fact going to Mrs. Williams's third through fifth claims and she is entitled to judgment as a matter of law on these claims.

40

Respectfully submitted,

Dated: August 3, 2021                          GARY W. ABER, P.A.

*/s/ Gary W. Aber*
Gary W. Aber (DSB #754)
704 N. King Street, Suite 200
P.O. Box 1675
Wilmington, DE 19899
(302) 472-4900 (Telephone)
(302) 472-4920 (Facsimile)
GAber@gablawde.com

KANTOR & KANTOR, LLP                    RENAKER HASSELMAN SCOTT LLP

*/s/ Elizabeth Hopkins*                      */s/ Teresa S. Renaker*
Elizabeth Hopkins (*pro hac vice*)          Teresa S. Renaker (*pro hac vice*)
Susan L. Meter (*pro hac vice*)             Kirsten G. Scott (*pro hac vice*)
Kantor & Kantor, LLP                        505 Montgomery Street, Suite 1125
19839 Nordhoff Street                       San Francisco, CA 94111
Northridge, CA 91324                        (415) 653-1733 (Telephone)
(818) 886-2525 (Telephone)                  (415) 727-5079 (Facsimile)
(818) 350-6272 (Facsimile)                  teresa@renakerhasselman.com
ehopkins@kantorlaw.net                      kirsten@renakerhasselman.com
smeter@kantorlaw.net

*Attorneys for Plaintiff, T. Kimberly Williams*

41