IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOSEPH WRIGHT, and T. KIMBERLY WILLIAMS,<br><br>        Plaintiffs/Counter-defendants,<br><br>  vs.<br><br>ELTON CORPORATION, GREGORY FIELDS, FIRST REPUBLIC TRUST COMPANY OF DELAWARE LLC, and M.C. DUPONT CLARK EMPLOYEES PENSION TRUST,<br><br>        Defendants/Counter-claimants/Third-party plaintiffs,<br><br>  vs.<br><br>JAMES B. WYETH, Solely as Executor and Personal Representative of the Estate of Phyllis M. Wyeth, MARY MILLS ABEL SMITH, CHRISTOPHER T. DUPONT, MICHAEL DUPONT, LUCY DUNNE, representative for HELENA DUPONT WRIGHT, KATHARINE D. GAHAGAN and JAMES MILLS,<br><br>        Third-party defendants. | **C.A. NO. 17-286**<br><br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter is before the Court for findings and conclusions after a bench trial.[1]

This is an action for relief under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1001 *et seq.*  This Court has jurisdiction under 28 U.S.C. § 1331

and 29 U.S.C. § 1132(e)(1).  In this action, plaintiff Kimberly Williams contends that a trust

---

[1] Also pending are on third-party defendant James B. Wyeth's motion for judgment as a matter of law, D.I. 465; and third-party defendant James Mills's motion for judgment, D.I. 468.  Those motions are resolved by the findings and conclusions in this order and will be denied.

instrument created by Mary Chichester duPont in 1947 is covered by ERISA.  She further contends that the defendants have breached their fiduciary duties by failing to operate the plan in compliance with ERISA, which has led to severe underfunding of the plan's liabilities.  She seeks injunctive and other equitable relief to bring the plan into compliance with ERISA and to ensure its operation in compliance with ERISA into the future.

I.      PROCEDURAL HISTORY

This case involves a pension plan (the "trust" or "the plan") that was established in 1947 by Mary Chichester duPont to provide pensions to her employees and to the employees of her children and her grandchildren.   She, her children, and her grandchildren are referred to in the trust document as the "qualified employers."  This action was originally brought in February 2016 in the United States District Court for the District of Maryland by two of these grandchildren/qualified employers—Helena duPont Wright and James P. Mills—against Defendant Elton Corporation ("Elton Corp."), formerly the trustee of the plan, and Gregory Fields, an employee of Elton Corp.[2]  Wright and Mills later filed an amended complaint adding the trust/plan itself and First Republic Trust Company of Delaware LLC ("First Republic"), the present trustee, as defendants.

In December 2016, Wright and Mills filed a second amended complaint (the operative complaint in the case), which, among other things, added two of their employees (both participants in the plan) as plaintiffs—T. Kimberly Williams, who was employed at that time by Helena duPont Wright, and Joseph Wright (no relation to Helena

---

[2] The evidence adduced at trial establishes that all of Fields's activities were performed in this course and scope of his employment.  His conduct is therefore imputed to defendant Elton Corp., and he will be dismissed as a defendant.

Du Pont Wright), who was then employed by Mills.[3]  D.I. 35.  On the defendants' motion, the case was transferred to this Court in March 2017.  D.I. 46.

Shortly thereafter, defendant First Republic filed a counterclaim against Wright and Mills and a third-party complaint against the other then-living qualified employers:  Mary Mills Abel Smith, Christopher T. duPont, Michael duPont, Phyllis Mills Wyeth, and Katharine duPont Gahagan.[4]  D.I. 61.  In its counterclaim and third-party complaint, First Republic seeks a declaration that each of the qualified employers is separately liable to fund the plan in accordance with ERISA.  *Id.*

The plaintiff then sought leave to file an amended complaint, alleging a putative class action and seeking realignment of the parties.  D.I. 207.  The Court denied the motion, finding a putative class action would not serve any useful purpose because the Court could impose plan-wide relief in any event and stating that, although the interests of the plaintiffs were at odds, it was not necessary to formally realign the parties since the action was to be tried to the Court and the same result could be achieved in the context of the pretrial order and by adjusting the order of proof.  D.I. 327.  Thereafter, the original plaintiffs, Helena DuPont Wright and James Mills moved to dismiss their claims against the trust defendants, effectively realigning themselves.  D.I. 373, 374.

The Court has determined that ERISA governs the plan.  D.I. 442.  The Court found that the plan is a defined benefit pension plan covered by ERISA, state trust law is preempted with respect to the plan, plaintiff Williams is a plan participant, and the

---

[3] Joseph Wright is now deceased, leaving Kimberly Williams as the only plaintiff.

[4] Phyllis Mills Wyeth died on January 14, 2019.  D.I. 130.  Michael du Pont died in November 2019.  D.I. 167.  Michael DuPont has been dismissed as a Third-party defendant.  D.I. 167.  The Estate of Phyllis Wyeth has been substituted in as a Third-party defendant.  D.I. 130, 131.  Also, Lucy Dunne has been substituted in as attorney-in-fact and substituted party for Helena duPont Wright.  D.I. 406.

defendants/third party defendants are all ERISA fiduciaries with respect to the plan.  *Id.*; *see also* D.I. 457, Memorandum and Order at 13.  Those findings are the law of the case and will not be disturbed herein.

The matter was tried to the Court and the Court took post-trial motions under advisement.  The Court permitted written closing arguments.  Plaintiff Williams contends that she proved at trial that defendants breached fiduciary duties in underfunding the plan, failing to tax-qualify the plan, making imprudent investments, and failing to maintain records and to provide required notices.  She also contends she has shown First Republic and Elton Corp. participated in disloyal conduct as evidenced by their seeking indemnification agreements.  James B. Wyeth, as executor of the Estate of Phyllis Wyeth (hereinafter, "Wyeth Estate") argues that:  1) plaintiff Williams and third-party defendant First Republic lack standing to sue the Wyeth Estate; 2) Phyllis Wyeth was not an employer engaged in commerce or in any industry or activity affecting commerce in her employment of the employees covered by the trust; 3) Phyllis Wyeth is not a named or functional fiduciary; 4) the Wyeth Estate cannot be liable as a plan administrator of the plan; 5) and the Wyeth Estate cannot be liable for funding the trust (i.e. the single employer plan).  The Wyeth Estate and several other qualified employers also argue that the plaintiff Article III standing as well as standing under ERISA because the trust/plan is not a single employer plan, but is actually five separate plans.  James Mills argues that he never had an employee that was eligible for benefits from the trust.

II.    FINDINGS OF FACT

A.    Undisputed Facts

The parties agree to the following relevant facts.  D.I. 436, Pretrial Order ("PTO") at 7–10; *see also* Trial Transcript ("T. Tr.") at 13.  Kimberly Williams was employed by a single qualified employer—Helena duPont Wright.  D.I. 436, PTO at 7.  Her birthdate is September 22, 1965.  *Id.*  Her employment with Wright terminated on July 11, 2018.  *Id.* She was never employed by Elton Corp. or by First Republic Trust Company of Delaware, LLC.  *Id.*  While employed by Wright, Williams primarily worked in an office located on Unicorn Farm, Wright's homestead in Maryland.  *Id.* at 10.  Williams resided in Maryland for the entire period of employment with Wright.  *Id.*

In the trust, Mary Chichester duPont designated herself; her children (A. Felix duPont, Jr., Lydia C. duPont, and Alice duPont Mills); her daughter-in-law (Allaire Crozier duPont); and her grandchildren as "qualified employers."  *Id.* at 7.  Helena duPont Wright, James P. Mills, Phyllis Mills Wyeth, Mary Mills Abel Smith, and Kathryn duPont Gahagan are all grandchildren of Mary Chichester duPont and are defined as qualified employers under the trust.  *Id.*; T. Ex. 53, Trustee Release and Indemnification at 1–2.  All of the grandchildren were either minor children or were not yet born when the trust was established in 1947.  D.I. 436, PTO at 9.

The trust defines "pensioner" as "any domestic employee or any employee rendering secretarial, accounting or other assistance in the management of his employer's private, financial or social affairs" for a qualified employer, and who was continuously employed for 10 years and reached age 65 or met certain other criteria.  *Id.* at 7.  The trust provides that a Pensioner would receive an annual benefit of 60% of his

or her annual salary or wages in effect when the Pensioner met the eligibility requirements, plus an additional 1% for each year of service above 10 years.  *Id.*  It also provides that each qualifying Pensioner, as defined in the trust, is entitled "to an annual pension for the life of such Pensioner or during the continuance of this trust, whichever is shorter."  *Id.*  The trust also provides one (1) year of benefits for a deceased Pensioner's surviving spouse.  *Id.* at 8.  The trust further provides that the trust "shall continue until twenty (20) years after the death of the last surviving grandchild of the trustor who is living at the execution of this trust agreement or until the entire corpus of the trust and all additions thereto and all income accrued thereon shall be exhausted, whichever event shall happen first."  *Id.*  On the termination of the trust, the rights of any pensioners or other beneficiaries were to have ceased.  *Id.*

Mary Chichester duPont funded the trust with 50 shares of common stock of Christiana Securities Company, a holding company for common stock of the duPont Company.  D.I. 436, Pretrial Order at 8; *See E.I. duPont de Nemours & Co. v. Collins, 432 U.S. 46, 57 (1977)* (noting that in 1977, Christiana Securities Company was merged into duPont, and the trust's Christiana stock was converted to duPont stock.).  By 1999, the trust held 112,772 shares of duPont stock, worth about $7.4 million.  D.I. 436, PTO at 8.  Other than the initial contribution of stock shares made by Mary Chichester duPont, no qualified employer under the trust has ever subsequently contributed anything to the trust assets.  *Id.*

The trust provides the trustee with the exclusive authority and discretion to manage and control the assets of the trust.  *Id.* at 8.  The trust authorizes the trustees to "retain any and all stocks, bonds, notes, securities and/or other property hereby or hereafter

6

transferred to this trust" and to "accept additions to this trust by way of gift, bequest, or otherwise from any person or persons whomever, but does not specifically require that any person make any gift, bequest, contribution, or funding for the trust." *Id.* The trust also authorizes its trustees to appoint their successors and to appoint successors for trustees who die. *Id.* at 9.

After she established the trust, Mary Chichester duPont appointed her three children—Lydia C. duPont, A. Felix duPont and Alice duPont Mills—as trustees. *Id.* Lydia duPont died in 1958; the remaining trustees, Felix duPont and Alice duPont Mills, replaced Lydia as trustee with their sister-in-law Allaire duPont (also a qualified employer under the trust). *Id.*

In about 1980, Felix duPont and Alice duPont Mills hired Gregory Fields, who had previously worked at the duPont Company, to be the manager of their "family office," providing financial services to their family members. *Id.* In 1984, the Mills branch of the family—Alice duPont Mills and her children, Mary Mills "Mimi" Abel Smith, Phyllis Mills Wyeth, and James P. Mills, Jr.—established the B-103 Corporation "[t]o provide financial management, accounting and administrative services to members of the Mills family." *Id.* at 9.

Alice duPont Mills and Allaire duPont resigned as trustees in late 1989, at Felix duPont's suggestion, leaving Felix duPont as the sole trustee. *Id.* In about 1990, Felix duPont incorporated his family office as Elton Corp., and employed Gregory Fields as Elton Corp.'s business manager. *Id.*

Felix duPont was the sole owner of Elton Corp. during his lifetime. *Id.* In July 1991, Felix duPont appointed Elton Corp. as the corporate co-trustee of the trust. *Id.*

When Felix duPont died in 1996, Elton Corp. became the sole trustee.  *Id.*  In 1996, Katherine Gahagan and her brothers Christopher and Michael duPont became Elton Corp.'s stockholders, with Gahagan holding 60% and her brothers splitting the remaining 40%.  *Id.*  Gahagan also became President of Elton Corp. and holds that position to this day; her brothers became Vice-Presidents.  *Id.*

Elton Corp. served as trustee of the trust from 1991 until 2015.  *Id.*  First Republic was appointed as the successor trustee of the trust in 2015 and remains the trustee of the trust today.  *Id.*  First Republic was selected as the successor trustee of the trust, in part, because an investment manager for the trust had moved from PNC Bank to an investment subsidiary of First Republic Bank, and Elton Corp. sought to have the trust follow.  *Id.*

There is no dispute that none of the grandchildren were ever appointed as trustees of the trust, nor did any of them establish the trust.  *Id.* at 9–10.  The trust paid federal and state income taxes.  *Id.* at 10.

In 1988, Fields prepared a memo to the qualified employers recommending that the trust be terminated, and annuities be purchased to replace the pensions for current pensioners and employees over age 55.  *Id.*  In March 2000 Fields wrote to Gahagan and Michael and Christopher duPont reporting that the trust's income trailed its then-current pension payments by about $20,000 annually.  *Id.*

In 2004, after entering into an investment management agreement with PNC Bank and retaining the power for Elton Corp. to approve all investment transactions with the plan assets, Elton Corp. arranged to transfer the trust's 112,772 shares of duPont stock to PNC.  *Id.*  In March 2005, Elton Corp. entered into an addendum to this agreement

allowing PNC to deal with trust assets in its own interest.  *Id.*  In February 2005, Elton Corp. executed an Investment Policy Statement for the trust, selecting an asset allocation of 65% equity and 35% fixed income.  *Id.*

The purchase contract with PNC disclaimed any fiduciary responsibility of PNC as the purchaser of the shares.  *Id.*  On one or more occasions, Elton Corp. asked one or more qualified employers or their representatives to list their employees who would potentially become eligible for pensions under the trust.  *Id.*

In 2015, prior to agreeing to become the trustee, First Republic requested that Elton Corp. obtain a legal opinion regarding whether or not ERISA covered the trust.  *Id.*  The Mand Marblestone Group provided an opinion that the trust was not covered by ERISA, which was provided to First Republic.  *Id.*  First Republic had no knowledge of the Wagner Group November 2015 opinion prior to it becoming the trustee of the trust.  *Id.*

### B.    Evidence at Trial

The record shows that the plan does not provide for an individual account for each participant, and it does not segregate accounts per qualified employer.  T. Tr. at 414–15; Ex. 187, Requests for Admission Nos. 17, 18.

Gregory fields testified as to his duties as trustee.  T. Tr. 290–91, 298–300.  He stated he kept the books and records of the trust and filed federal and state income tax returns for the trust.  *Id.* at 298; *see also* T. Ex. 234, Responses to Interrogatories at 2–3.  The trust paid Elton Corp. for administration of the pension trust.  T. Tr. at 313.  Elton Corp. sent the qualified employers pension trust financial statements on an annual basis.  *Id.* at 314–16.[5]  During the time that Elton Corp. was trustee of the pension trust, each

---

[5] Financial statements in the record show that the trust had assets in the amount of $6,277,683 at the end of 1998, T. Ex. 51, and assets in the amount of $3,787,909 and the end of 2014.  T. Ex. 47.

qualified employer was responsible for notifying Elton Corp. of employees who might be eligible to receive benefits under the trust.  *Id.* at 319–20.  After receiving a letter from a qualified employer asking that an employee be put on the pension or start receiving benefits under the pension trust, Elton Corp. then evaluated the information to determine whether it agreed that the submitted employee was eligible for benefits.  *Id.* at 324.  Elton Corp. would confirm in writing to the employee that he or she would receive a pension under the trust pursuant to the qualified employers' request.  *Id.*  Employees were not necessarily told about the existence of the trust or their potential eligibility for benefits under the trust.  T. Tr. at 452, 642–45.

Fields testified it is the trustee's decision on how to interpret the trust.  *Id.* at 492. Elton Corp. had interpreted the trust not to include employees of any corporate entity that was for-profit business or profit-making activity as qualified employees.  *Id.* at 447, 463, 493.  Eligible employees would include chauffeurs, gardeners, cooks, stable-hands, housekeepers, groundskeepers, accountants, secretaries, personal assistants, and lawyers.  *Id.* at 297.  Fields acknowledged there were employees "straddling between doing the private family work and also doing for-profit business.  *Id.* at 447.  Fields testified there was a business aspect to Chadds Ford Stables, Bohemia Stables and Bird Mill Farms.  *Id.*

Likewise, Alison Westbrook, Senior Managing Director at First Republic, testified as to First Republic's duties as trustee.  *Id.* at 56–80.  She stated that First Republic administers the trust and performs the duties of trustee.  *Id.* at 563.  She stated that First Republic makes all determinations related to the trust administration.  T. Tr. at 560, 579, 583–85.  She is the assigned trust officer for the trust.  *Id.* at 562.  Westbrook also testified

that there is no other person or entity that has oversight over First Republic's administration of the plan.  *Id.* at 564.

She delegates the actual day-to-day investments to First Republic's affiliate, First Republic Investment Management.  *Id.* at 569.  She testified that Paul Emata is the wealth manager at First Republic Investment Management, and he is the individual who "was the connection because he worked for PNC and managed the assets while Elton was the trustee."  *Id.*  When he moved to First Republic "he essentially wanted to bring that relationship with him."  *Id.*

First Republic has paid its attorney fees in this case with trust assets.  *Id.* at 574. Westbrook testified "its customary to pay attorney's fees out of trust assets if the legal expenses are in connection with the trust.  *Id.* at 570.  She further stated that "our view is that there are no claims against First Republic itself, only in its capacity as trustee for the trust."  *Id.*  She stated that First Republic has always maintained the trust as a personal trust and not as an ERISA retirement plan.  *Id.*  She testified that position was based on a legal opinion about the status of the trust that had been requested by her former boss, Mike Harrington, before he would accept appointment as successor trustee.  *Id.* at 574– 75.  She testified First Republic would never have accepted the appointment as successor trustee if it had thought the trust was an ERISA plan.  *Id.*  She also stated that First Republic had asked for the opinion because the trust had "pension" in its title.  *Id.* at 577. Further, she stated that First Republic has never independently analyzed whether ERISA governs the trust.  *Id.* Trustee fees and investment management fees are also paid to First Republic by the trust.  *Id.* at 571–72.  Westbrook testified that the trust assets were $2.7 million at the time of trial.  *Id.* at 569–70.

Westbrook also testified that First Republic believes it does not have the capability, or is not qualified, to administer an ERISA plan.  *Id.* at 579.  First Republic files 1041, fiduciary income tax return for the trust.  *Id.*  It has never attempted to file a Form 5500 with the Department of Labor with respect to the pension trust.  *Id.* at 580.  It has never prepared or provided a "summary plan description" to the beneficiaries of the trust, nor has it pension benefits statements in connection with the trust.  *Id.* at 578.  It has not attempted to inform potential beneficiaries about the trust, and it relies on relatives of a deceased beneficiary to inform First Republic if the deceased beneficiary has a spouse.  *Id.* at 579.  It has never paid any benefits to survivors of any beneficiaries or the trust.  *Id.*  Westbrook also testified First Republic has not attempted to determine the necessary funding to pay benefits under the pension trust, nor has it had any contact with the qualified employers with respect to the management of the plan.  *Id.*  She also testified that First Republic does not communicate with the qualified employers at all and, in fact, have determined that they are not interested parties and hold no power under the trust document to give any input or direction for trust administration purposes.  *Id.* at 589.  Further, First Republic has never attempted to get the qualified employers to make additional contributions or to provide additional funding for the pension trust.  *Id.* at 579.

Elton Corp. hired PNC Bank to manage the investments of the trust.  *Id.* at 473, 503; *see* T. Ex. 60, Resolution dated June 24, 2004 (allowing President of Elton Corp. to establish an investment management account with PNC).  Paul Emata, managing director of First Republic Investment Management in New York, testified to the type of investments in the trust.  *Id.* at 720.  He stated that in 2004, the majority of the trust's holding were in DuPont Company stock.  *Id.*  He testified it was a trust company's strategy to address any

kind of concentrated risk in a single stock and that there is "a strategy that allows immediate diversification out of that single stock concentration without actually selling the stock at that time," known as a prepaid forward contract or a variable prepaid forward contract. *Id.* He stated that he used to strategy because it "reduced the potential of catastrophic loss," though he acknowledged that "it can happen." *Id.* at 731. The record shows that Katharine Gahagan, as President of Elton Corp. authorized Emata, then at PNC Bank to purchase three currency forward contracts lasting until November or December of 2007. T. Ex. 62, emails between Katharine Gahagan and Paul Emata at 1. The three currencies were Euros, Japanese Yen and Canadian Dollars and were in sums of the equivalent of approximately $1,500,000 apiece making a total of about $4,500,000 or about 75% of the Pension Trust's portfolio. *Id.* Emata also testified that someone in the First Republic legal department informed him of this Court's 2019 ruling that the pension trust is subject to ERISA. T. Tr. at 731–32.

The record shows that the descendants of Mary Chichester duPont were engaged in employment activities through various entities, including Elton Corp., B-103 Corp., Chadds Ford Stables, Hickory Tree Farm, Hickory House Farm, Bohemia Stables, and Bird Mill Farms. T. Tr. at 321–22, 329–32, 338–39, 446–48, 443–60. Gregory Fields testified that employees of Elton Corp. provided financial, tax and estate planning services for Felix duPont, Katharine Gahagan, Christopher duPont and Michael duPont. *Id.* at 292–94. The employees of B-103 Corp. provided financial management, accounting and administrative services to the Mills family, including James Mills, Mary Mills Abel-Smith and Phyllis Wyeth.[6] T. Tr. at 321–22, 329–30; *see also* T. Ex. 252, Payroll Records and

---

[6]Bohemia Stables and Bird Mill Farms are or were commercial entities embedded in B-103 Corp. T. Tr. at 446-47.

Employee Census Data ("Payroll Data") at 484, 488, 495, 507, 522, 534 (showing Constance Howells as an employee of B-103). In addition, some of the B-103 employees had worked with Fields providing services for the duPont family before B-103 was formed. T. Tr. at 331–32.

Fields testified that Chadds Ford Stables was Phyllis Wyeth's horse racing and breeding operation. *Id.* at 338–39. He testified that the entity was set up in or around 2012 or 2013 and that some employees had worked for Wyeth for a number of years prior to that date. *Id.* at 340–42. One of its employees was Robert Weeks whose position is listed as grounds maintenance, and Wyeth specifically included him on the list of her employees who provided "services" as defined in the interrogatory request consistent with the definition in the trust. T. Ex. 253, Interrogatory Answers at 8; *see also* T. Ex. 252, Payroll Data at 557, 581, 602, and 620. Wyeth also offered retirement benefits to her employees and the employees of B-103 Corp. outside of the trust, through a section 408(c) SIMPLE IRA. T. Tr. at 518–25; *see also* T. Ex. 252, Payroll Data. She matched employees' contributions up to three percent. *Id.* at 521. She also made bequests to her employees as part of her estate planning. *Id.* at 530–31. Those employees received three times their annual salaries when Wyeth died. *Id.*

Hickory Tree Farm, Inc. and Hickory House Farm are entities owned by Mary Mills Abel-Smith. T. Tr. at 447–48. Fields testified that Lee Roy Bettis was an employee of Hickory Tree Farm, Inc. and first worked for Abel-Smith's mother and then later for Abel-Smith. T. Tr. at 399. Abel-Smith produced payroll summaries for Hickory House Farm showing domestic and other household employees performing services such as butler, cook, farm manager, groom, house manager, housekeeper, caregiver, and secretary. T.

14

Ex. 252, Payroll Data at 443–60.  Abel-Smith listed these employees in response to the plaintiff's interrogatory requesting employee information for individuals that meet the categories of employees set forth in the trust.  T. Ex. 248, Interrogatory Answers at 6–7; T. Ex. 259, Interrogatories.

The record shows that every one of the qualified employers has employees who have already received pension benefits, has an eligible employee, or has slotted one or more of their employees to receive such benefits and thus expressed an intent to provide benefits.  T. Ex. 78, Deposition of James P. Mills, Jr. ("Mills Dep.") at 12 (indicating Lisa Flagg is his employee); T. Exs. 104–05, emails with attached spreadsheets showing potential beneficiaries of various employers; T. Ex. 113, pension determination letter for Gisela Banks, employee of Phyllis Wyeth; T. Ex. 115, pension determination letter for Diane Treyfrey, employee of Helena duPont Wright; T. Ex. 117, pension determination letter for James Jeanette, employee of A. Felix duPont, and later, Elton Corp.; T. Exs. 118–21, pension determination letters for Lee Roy Bettis, Mary Kirkpatrick, Patricia Owens, Robert Dunn, Sr., employees of Mary Mills Abel-Smith; T. Ex. 122, pension determination letter for Zenaide Vieira, employee of Katharine Gahagan; T. Ex. 124, pension determination letter for Marie Rossell, employee of A. Felix duPont, Jr., and later, Elton Corp.; T. Ex. 106, Expert Report of Noor Rajah ("Rajah Expert Report") at 29-1504 (showing actual and potential participants and pensioners for all qualified employers); T. Exs. 242, 248, 249, 251 (Answers to Interrogatories).

Christopher duPont, a qualified employer and a part-owner of Elton Corp, had employees that worked for Elton Corp., one of whom is already receiving a pension.  T. Tr. at 327; T. Ex. 124, Marie Rossell pension determination letter.  James Mills added his

15

now-deceased employee, Joseph Wright, to the roster to receive a pension, and added him as a plaintiff in this case.  T. Ex. 78, Mills Dep. at 12; D.I. 35, second amended complaint.  Although Fields testified that James Mills "never had any employees who qualified for benefits under the trust," T. Tr. at 473–75, Mills testified that he had intended to provide a pension for Joseph Wright, who is now deceased, under the trust.  T. Ex. 78, Mills Dep. at 12.  Mills stated his caretaker, Barry Hoffman, would not be eligible for a pension under the trust because Mills would "take care of him myself personally.  *Id.* at 14.  Mills has not paid out any benefits due under the trust.  T. Tr. at 469–70; 586.

Fields testified that he believes he is eligible for benefits under the pension trust and so is Deborah Healy, another Elton Corp. employee.  T. Tr. at 551.  He testified that he had "no intention or desire to be part of the plan because he [had] already been taken care of.  *Id.* at 551.  Fields testified that his employer (through Katherine Gahagan, as president of Elton Corp.) knew the trust would not last forever" and she "wanted to do what she suggested all the qualified employers do, [] take the burden off the existing trust."  *Id.* at 455.  She did this separate and apart from the existing trust.  *Id.* at 455–56.

The record shows that certain qualified employers have always contemplated the possibility of correcting "whatever flaws may exist" in the trust, including making contributions to the plan.  *See, e.g.*, T. Ex. 22, letter dated April 17, 1997, from Alice Mills to Katherine Gahagan (noting that "over the past couple of years, a number of discussions have arisen about how the trust might be changed to comply with current laws governing pensions); T. Ex. 23, Letter dated June 6, 1997 from Alice Mills, Mimi Abel-Smith, James Mills, and Phyllis Wyeth to Katherine Gahagan (discussing reforming the trust or creating new trusts for each branch of the family); T. Ex. 151, document dated December 27, 1984

16

from fields to then-trustees Alice duPont Mills, Allaire C. duPont and A. Felix duPont, copied to Katherine Gahagan, James Wyeth, Richard duPont, Jr., and Christopher duPont, proposing alternative solutions to  the problem that the trust would soon be incapable of providing promised benefits, including additional contributions of principal). James Mills later proposed:

> I would be more interested in pursuing a solution that allows me (and others) to have at least one of our employees share in the Clark Trust, even if that means that we all contribute a lump sum to the Trust.

> I'm sure that we could have an actuary look at this, look at the employees who are currently on the plan and those we expect to put on the plan, and let us know the proper amount that each of us should contribute in order to ensure that the trust will continue until those employees have all died.

T. Ex. 172, Letter dated March 31, 2014, from James P. Mills, Jr. to Katharine Gahagan (noting insufficiency of funds in trust and unfairness of some family members benefitting and not others).

Fields testified that he has a law degree but did not work at Elton Corp. as a lawyer. T. Tr. at 363.  The record shows that over the years, several law firms advised the qualified employers that ERISA could govern the plan.  *See, e.g.*, T. Ex. 21, Letter dated May 29, 2002, from Ivins Phillips attorney Kevin O'Brien to Fields ("O'Brien Letter) with attached draft letter summarizing the discussion at a meeting in May of 1998 relating to possible approaches to handling the trust); T. Ex. 26, Letter dated July 31, 1986, from Richards, Layton & Finger to Fields (relating to purchase of annuity contracts and termination of trust); T. Ex. 27, Letter dated April 15, 1986, from Carol Nickel, Esq., an attorney Ivins Phillips & Barker ("Ivins Phillips") to Ronald Mistretta, was then the business manager for several qualified employers including Allaire duPont, the owner of Bohemia stables ("1986 Letter") (involving a potential legal action against the trust); *see*

17

*also* T. Ex. 161, Email dated November 30, 2015, from Phyllis Wyeth to Lisa Flagg (forwarding an attorney's October 14, 2015, memo and the Wagner Law Group's November 9, 2015 opinion letter).

In 1986, In response to a question from Ronald Mistretta, then the business manager for Allaire duPont, regarding the potential obligations of the trust if an employee who had recently resigned were to bring a legal action to collect a pension, the Ivins Phillips law firm analyzed the possible impact of ERISA on the trust.  T. Ex. 27, Ivins Phillips 1986 letter.  Ivins Phillips determined that the firm had communicated with the then-trustee, Felix duPont in the early-to-mid-seventies.  *Id.* at 1.  An attorney at Ivins Phillips had told Felix duPont that "there was a serious risk that the ERISA changes could be applicable to the [trust at issue], although there were some legal and equitable arguments to the contrary."  *Id.*  However, the trustee at the time, Felix duPont, took no action to bring the plan into compliance.  *Id.* (stating "[a]pparently consideration was given to attempting to obtain a definitive Labor Department interpretation but was rejected by duPont on the basis of cost and the complexities of attempting to comply if required."); *see also* T. Tr. at 367–68.  Ivins Phillips proposed that Allaire duPont negotiate a settlement with the employee.  T. Ex. 27, 1986 Letter at 2.  It further advised that, if alerted to the continued existence of the trust, the Labor Department "might attempt to bring an action in the Delaware Chancery Court to have the trust amended to comply with ERISA requirements, such as vesting and increased spousal benefits and might also attempt to assess penalties for failure to file forms and deal with other ERISA procedural requirements."  *Id.* at 1.

In 1984, Gregory Fields wrote to then-trustees Alice duPont Mills, Allaire duPont and Felix duPont about "the ability of the Pension Trust to meet the future needs of its beneficiaries. . .. [S]teps must soon be taken to redesign the means by which pension benefits will be made available to present and future employees of yourselves and your children." T. Ex. 151, Memo dated December 27, 1984, from Fields letter to then-trustees Alice duPont Mills, Allaire C. duPont and A. Felix duPont, Jr., with attached exhibits. Fields copied qualified employers Katharine Gahagan, Phyllis Wyeth, and Christopher duPont on this memo. *Id.* at 704. In addition, Fields attached a list of 21 "Pensioners – Present and Potential" with their actual or projected pension amounts. *Id.*, Ex. A. He also presented two alternatives of "how, based on current investment strategy, the Pension Trust [could] attempt to meet the pension demands placed on it. *Id.*, Ex. B. He suggested "capping" present employees and creating separate pension funds for present and future employees. Fields concluded that "[i]n my opinion the creation of separate pension funds for each employer provides the most realistic and practical means for accommodating future needs. The concept of a single plan serving multiple employers with varying employee groups does not appear workable." *Id.* at 2.

In 1986, Fields requested and received a legal opinion from the Richards, Layton & Finger law firm ("Richards Layton") regarding the possibility of purchasing annuity contracts for the twelve pensioners then receiving benefits. T. Tr. at 420–22; T. Ex. 26, Letter dated July 31, 1986, from Richards, Layton to Fields. In the letter, the lawyer acknowledged that Fields "represented that the trust will be exhausted well before its mandated termination unless most of the current employees forego their rights to it." *Id.* at 565–66. Richards Layton recommended that the trustees should purchase such

19

contracts and terminate the trust only after having received instructions from the Court of Chancery that they could do so.  *Id.* at 20, 24.

In 1988, Fields sent a memo to the qualified employers recommending that the Trust be terminated, and annuities be purchased to replace the pensions for current pensioners and employees over age 55.   T. Ex. 225, package of documents titled "Termination of M.C. DuPont Trust" with attachments including a draft petition, draft letters, and draft waivers to employees and pensioners.  In that memo, Fields noted that

> [b]eginning with the calendar year 1987, the Pension Trust has and will be faced with paying-out pensions far greater than its annual income . . . Trustees expect this trend to continue indefinitely as more employees become pensioners.  Simply stated, the Pension Trust was not established and funded to meet the employee salaries of today.

T. Ex. 225, Memo at 30.  Fields stated that at that time the fair market value of the pension trust assets was $1,800,000 and he had been quoted between $1,100,000 to $1,250,000 to purchase the required single-premium annuities.  *Id.* at 1.  However, this solution to the funding issues was never pursued.  T. Tr. at 424–26.

Robert Morris, a former employee of Allaire duPont's Bohemia Stable, engaged the law firm of Young, Conaway, Stargatt & Taylor ("Young Conaway") to pursue a claim for benefits under the Pension Trust in 1988.  T. Ex. 98, Letter dated July 24, 1991, from Fields to David Hamilton, Esq., an attorney at Morris, Nichols, Arsht and Tunnel, with attached letter dated March 16, 1988, from Young Conaway to Fields.   Young Conaway maintained that "the retirement program funded by the Trust is a funded pension plan covered by ERISA even though it may be a nonqualified pre-ERISA plan" and argued that because Morris had more than 10 years of service, he was vested under ERISA despite having terminated employment before reaching age 65.  *Id.* at 2.  The trust and duPont together paid Morris all or most of his demand for $115,522, which represented the then

present value of his pension under the Pension Trust plus attorneys' fees.  T. Tr. at 395–96.

The evidence at trial shows that after Felix duPont's death in 1996, a schism developed as the Mills branch of the family pressed to bring the plan into compliance with ERISA while the other qualified employers resisted.  In April and June 1997, several of the Mills qualified employers (Alice Mills, Mary Mills Abel-Smith, and Phyllis Wyeth) wrote to Gahagan, urging that the family resolve the "continuing issue of the pension trust" before "the Internal Revenue Service or an ex-employee's attorney decide[s] for us."  T. Ex. 22, letter dated April 17, 1997, from Alice Mills to Katherine Gahagan.  In June 1997, Alice Mills, Mary Mills Abel-Smith, Phyllis Wyeth and James Mills, Jr., followed up with another letter to Katherine Gahagan, again urging that "reforming the trust to conform with current pension laws is the best solution available."  T. Ex. 23, Letter dated June 6, 1997, from Alice Mills, Mimi Abel-Smith, James Mills, and Phyllis Wyeth to Katherine Gahagan.  Abel-Smith also wrote to Gahagan individually, urging that the trust "be reformed," and expressing that "in so doing, many of the tax benefits accorded to pension funds under current law could also be applied to this trust as well."  T. Ex. 31, Letter dated July 9, 1997, from Abel Smith to Katharine Gahagan.  Gahagan incorrectly responded that all previous legal opinions had concluded that the trust could not be reformed to comply with ERISA.  T. Ex. 30, Letter from Katherine Gahagan to Alice Mills, Mary Mills Abel Smith, Phyllis Wyeth and James Mills.

In 1998, Ivins Phillips met with the trustees to discuss the trust, at the request of Mary-Mills Abel Smith.  T. Ex. 8, Letters from Abel Smith to Middleburg Bank and Wilmington Trust Co. with attached Memo dated April 9, 1998, summarizing a meeting

between the trustees and Ivens, Phillips's attorney Kevin O'Brien.  The memo explains

that "[o]ne of the major issues" confronting the trust was the potential that the trust "could

be deemed to be not in compliance" with ERISA, thus triggering penalties and probably

litigation."  *Id.* at 1 (also noting that noncompliance with ERISA was an issue successfully

raised by a former employee in achieving an out-of-court settlement).  A possible solution

presented was the creation and funding of separate ERISA-compliant pension benefit

plans for each qualified employer.  *Id.*  The attorney's "suggestions were geared towards

solutions which would exclude the need to appear in Chancery Court . . . and thus avoid

publicity."  *Id.*

In March 2000, Fields reported to Gahagan, Michael duPont and Christopher

duPont that the trust's income trailed its then-current pension payments by about $20,000

annually.  T. Ex. 81, Memo dated March 2, 2000, from Greg Fields to Katharine Gahagan,

Michael duPont and Chris duPont at 9.  In 2002, Fields discussed ERISA and tax issues

with Ivins Phillips attorney Kevin O'Brien.  T. Tr. at 374.  O'Brien outlined several courses

of action:  1) do nothing; 2) seek labor department concurrence that the trust is not an

ERISA plan; and 3) apply to Delaware Chancery Court to seek reformation to comply with

ERISA.  T. Tr. at 375.  Katharine Gahagan did not approve seeking an advisory decision

from the DOL.  T. Tr. at 372.

In December 2002, former Hickory Tree Farm employee Lee Roy Bettis made a

claim for benefits under the trust.  T. Ex. 100, Letter to Fields from David Ley Hamilton

(noting "[a]lthough the trust does not purport to be a qualified plan, I think we have all

recognized the likelihood that it would be governed by applicable provisions of the laws

applicable to qualified plans.").  The letter from Bettis's attorney noted that another

Hickory Tree Farms employee, Mr. Moffett, and an employee of Bohemia Stables, Mr. Morris, had received benefits from the trust under circumstances substantially identical to those of Bettis. *Id.* at 2. In 2013, Phyllis Wright's attorney, Philip O'Donoghue, wrote to Fields inquiring as to the eligibility of several of her personal employees. T. Ex. 17 at 3, Letter dated November 14, 2013.

In January 2014, Elton Corp. compiled information on 24 current and projected pensioners, concluding that with income of 3% and no employer contributions, the plan assets would be exhausted in 2023. T. Exs. 103, 104; T. Tr. at 382–90. Varying the participants and trust income produced results in which the trust was expected to run out of funds several years later. T. Ex. 105, Memo from Fields to Phillip O'Donoghue with attached pension calculations (projecting funds would be depleted between 2026 and 2027); T. Tr. at 392–93. These spreadsheets projected that the trust's funds would soon run out, even without consideration of additional individuals that would need to be added—retroactively and prospectively—if the trust were administered as an ERISA plan. T. Tr. at 536–37.

Fields also testified that Elton Corp., as trustee of the trust, made the decision to select First Republic as its successor trustee. T. Tr. at 476. Katharine Gahagan testified at her deposition that it was decided that Elton Corp. should no longer be the trustee because "[i]It was becoming a liability" and "we wanted somebody else to take over and run it." T. Ex. 77, Deposition of Katharine Gahagan at 22. One of the qualified employers, Phyllis Wright, asked for a different trustee, but Elton Corp. chose First Republic. *Id.* at 531. On April 24, 2015, Katharine Gahagan, as President of Elton Corp., wrote to the other qualified employees that "First Republic Trust Company of Delaware, LLC ('First

Republic') has agreed to assume trustee responsibility of the Pension Trust.  Mr. Paul

Emata recently joined First Republic as a Managing Director and will assume

management of the Trust's portfolio."   T. Ex. 74, Letter with attached Statements of

Investment Policy, fee schedules, and Trustee Releases and Indemnifications.  Gahagan

also wrote to Paul Emata that

> Elton will assist in making sure the transition goes as smoothly as possible.
> Going forward, I suggest First Republic make available, to all qualified
> employers, semi-annual financial statements of the Trust.  In addition,
> please consider hosting an annual investment review for such employers.
> Finally, as new pensioners are proposed for benefits from the Trust, it would
> be a good idea for First Republic to circulate, to all qualified employers, the
> documentation you receive supporting additions to the pension roll.

T. Ex. 129, Letter dated July 29, 2015.

Fields testified that First Republic requested that the qualified employers sign

releases before it would become successor trustee.  T. Tr. at 356.  The releases were to

indemnify with respect to decisions made by Elton Corp. as the prior trustee.  *Id.* at 356–

59.  James Mills and Helena duPont right did not sign the document.  *Id.* at 358; *see* T.

Ex. 200, Trustee Releases and Indemnifications.  Fields testified that Elton Corp. had

requested similar releases from the qualified employers.  T. Tr. at 357.

Before it agreed to take over as trustee, First Republic also asked Elton Corp. to

obtain a legal opinion stating that ERISA did not cover the plan.  T. Exs. 17, Email from

Greg Fields to Tim Snyder with chronology and attached draft documents; T. Ex. 159,

Email from Greg Fields to Lisa Flagg forwarding Mand Marblestone opinion.  At First

Republic's suggestion, Fields approached the Mand Marblestone law firm for a legal

opinion on ERISA coverage of the trust.  *Id.* at 406, 529; T. Ex. 131, Letter from Mand

Marblestone PC to Greg Fields dated March 10, 2015 ("Mand Marblestone Letter"); *see*

*also* T. Ex. 17 at 4–6.  Fields characterized the request as follows: "Paul [Emata]'s

institution seeks assurance that the trust does not come under ERISA rules." *Id.* at 405;
T. Ex. 159, Email to Ken Marblestone.

Mand Marblestone gave the opinion that ERISA did not govern the trust.  T. Ex.
131, Mand Marblestone Letter at 1.  Its opinion referred "a trust to benefit domestic
employees" and acknowledged that "[t]here is no question that domestic employees are
in fact employees, and that the household employing them is an employer."  *Id.*  Its
determination that ERISA did not cover the trust was based on a theory that wages to a
household or domestic employee are not considered payments made in the course of a
trade or business and suggesting that if there is not a trade or business, there is no activity
that could be deemed to be engaged in commerce or in any industry or activity affecting
commerce.  *Id.* at 3.  The opinion letter stated:

> Accordingly, it is our opinion that, while ERISA does not specifically exclude
> domestic employees from coverage, and there is no official ruling on the
> subject.  Based on the facts presented, the trust should not be subject to
> the jurisdiction of ERISA because the trust does not involve an employee
> engaged in commerce or in any industry affecting commerce. The employer
> does not fall within any of the examples listed, the employees are not
> working in a trade or business for the production of income for the employer,
> and the activities of such employees are limited to services within domestic
> residences.

*Id.*  Elton Corp. resigned as trustee and First Republic accepted the position effective
August 7, 2015.  T. Ex.129, letter from Katharine Gahagan to Paul Emata with attached
resignation and acceptance documents; T. Ex. 17 at 1, chronology.

 However, because she had continuing concerns about the on-going issues with
the Pension trust, Helena duPont Wright sought another opinion regarding whether or not
ERISA applied from the Wagner Law Group.  T. Ex. 161, Email from Phyllis Wyeth to Lisa
Flagg forwarding Philip O'Donoghue's memo from October 14, 2015.  The Wagner Law
Group determined that ERISA governed the plan.  *Id.*, Wagner Law Group Letter at 3 ("It

is this firm's opinion that ERISA's jurisdictional requirements, specifically that an employer be engaged in commerce or in industry or activity affecting commerce, are satisfied by a plan which covers household employees."). That opinion was shared with the rest of the qualified employers, as well as with First Republic. *Id.* at 1, cover email (showing that the Wagner Law Group opinion was sent to Brandon Guillemin and Paul Emata at First Republic. In addition, First Republic employees were copied in on a memo dated November 25, 2015, to the qualified employers notifying them that actions would soon be taken to assure compliance with ERISA in connection with the trust, out of Helena duPont Wright's concern "not only for her own liability but even more for her estate and descendants if the issues with the trust remain unaddressed." *Id.* at 10. Wright filed this suit shortly thereafter, in February 2016, seeking to bring the Trust into compliance with ERISA, and seeking to remedy Elton Corp.'s and First Republic's breaches of fiduciary duties.

In addition, in December 2015, Fields sent an email to Timothy Snyder at Young Conaway, explaining a brief chronology of issues related to the trust, and attaching several key documents. T. Ex. 17, Email dated December 28, 2015, from Fields to Timothy Snyder, with attachments. The attachments include Ivins Phillips' 2002 opinion recapping discussions that had occurred in 1998 and outlining possible courses of action including 1) doing nothing; 2) seeking Labor Department concurrence that the trust in not governed by ERISA; 3) applying to Delaware Chancery Court for reformation of the Trust; 4) settling with charitable remaindermen and distributing trust assets to ERISA-qualified plans set up by the grandchildren/employers; and 5) purchasing annuity contracts for all existing pensioners and present employers. *Id.*, 2002 Memo at 6–7.

The evidence at trial confirmed that the qualified employers engaged in interstate commerce. *See, e.g.*, T. Tr. at 633–35 (plaintiff Williams' testimony that she worked for Wright primarily in Maryland, but she also traveled to Vermont, Pennsylvania and Delaware as needed for her work; and that Wright's other employees also traveled out of state with Wright to perform work); *see also* T. Ex. 78, Mills Dep. at 13–18 (testimony that employee Joseph Wright performed work for him both at Burnt Mill Farm, which is in Virginia, and in Cape Cod, Massachusetts, and drove Mills to and from those states); T. Ex. 248, Answers to Interrogatories, Ex. A (listing Abel-Smith's employees, including multiple then-present employees in Virginia, as well as Sherin Smart, a then-current employee in New York); Ex. 252, Payroll Data (payroll record of Gahagan, showing she paid employees Eric Bartlett and Zenaide Vieira, with state taxes withheld for Bartlett for the state of Delaware, and with state taxes withheld for Vieira for the state of Massachusetts).

Noor Rajah testified as an expert on behalf of the plaintiff. T. Tr. at 61-247, 249-75. The defendants and third-party defendants did not present opposing expert testimony. Rajah has a bachelor's degree in Actuarial Science and has over two decades of experience working in the field of actuarial science, with a focus on pension plans. T. Tr. at 61–65; Ex. 106, Rajah Expert Report at 26–28. He has worked for some of the largest employee benefit consultant firms in the country on all aspects of defined benefit plan design, funding and management. T. Tr. at 63–64.

Rajah had been provided participant data, payroll records, w-2s, and discovery responses. *Id.* at 72. There were 246 individuals identified in the records provided by defendants and third-party defendants to Rajah. *Id.* at 29. Rajah categorized the

individuals as active (currently working), vested termination (terminated from employment but vested with a pension benefit owed at age 65), deceased, retirees (those already receiving a pension from the plan), and other (employees whose employment terminated before their benefits vested).  T. Tr. at 77–78; *see also* T. Ex. 106, Rajah Expert Report at 15–16.  He did not calculate any liability for deceased participants or participants in the "other" category.  T. Tr. at 78.  Instead, he included them to make a clear record of his work.  *Id.*

Rajah utilized assumptions based on his decades of experience in practicing actuarial science and calculating funding liabilities where data was missing or incomplete. *Id.* at 81–82.  Noor Rajah calculated the pension liability to be between $37 and $38 million.  T. Tr. at 98; *see also* T. Ex. 107, Noor Rajah Reply Expert Report dated May 26, 2021 ("Rajah Reply Report") at 11.

II.     CONCLUSIONS OF LAW

A.      Law

The term "pension plan" is defined under ERISA to mean: "Any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or both, to the extent that, by its express terms or as a result of surrounding circumstances such plan, fund, or program – (i) Provides retirement income to employees."  29 U.S.C. § 1002(2)(A).  "Whether a plan exists within the meaning of ERISA is 'a question of fact, to be answered in light of all the surrounding facts and circumstances and from the point of view of a reasonable person.'"  *Deibler v. United Food & Com. Workers' Loc. Union 23*, 973 F.2d 206, 209 (3d Cir. 1992) (quoting *Wickman v. Nw. Nat. Ins. Co.*, 908 F.2d 1077, 1083 (1st Cir. 1990)).  "The ordinary trust

law understanding of fiduciary 'administration' of a trust is that to act as an administrator is to perform the duties imposed, or exercise the powers conferred, by the trust documents." *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996). Moreover, ERISA expressly contemplates a central role for plan trustees with respect to plan management and administration, providing, in relevant part:

> [A]ll assets of an employee benefit plan shall be held in trust by one or more trustees. Such trustee or trustees shall be either named in the trust instrument or in the plan instrument . . . or appointed by a person who is a named fiduciary, and upon acceptance of being named or appointed, the trustee or trustees shall have exclusive authority and discretion to manage and control the assets of the plan.

29 U.S.C. § 1103. Title I of ERISA covers:

> [A]ny employee benefit plan if it *is established or maintained* –
>
> (1) *by any employer engaged in commerce or in any industry or activity affecting commerce*; or
> (2) by any employee organization or organization representing employees engaged in commerce or any industry or activity affecting commerce; or
> (3) by both.

29 U.S.C. § 1003(a) (emphasis added). The statutory definition "uses the disjunctive 'established or maintained' and does not include any requirement that the employer administer or control the plan, fund, or program." *Solis v. Koresko*, 884 F. Supp. 2d 261, 278 (E.D. Pa. 2012), *aff'd*, *Sec'y U.S. Dep't of Lab. v. Koresko*, 646 F. App'x 230 (3d Cir. 2016). A lack of employer involvement in ongoing administration does not establish the absence of an ERISA plan. *Randol v. Mid-W. Nat. Life Ins. Co. of Tennessee*, 987 F.2d 1547, 1550 n. 5 (11th Cir. 1993); *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 417–18 (4th Cir. 1993); *Brundage-Peterson v. Compcare Health Servs. Ins. Corp.*, 877 F.2d 509, 509–10 (7th Cir. 1989)).

An "employer," is broadly defined as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan, and includes a group or association of employers acting for an employer in such capacity." *Id.* § 1002(5). The term "plan sponsor" is defined as "the employer in the case of an employee benefit plan established or maintained by a single employer," 29 U.S.C. § 1002(16)(B)(i), or "in the case of a plan established or maintained by two or more employers" as "the association, committee, joint board of trustees or other similar group of representatives of the parties who establish or maintain the plan." *Id.* § 1002(16)(B)(iii).

Consistent with its fundamental purpose of ensuring the "financial soundness" of employee benefit plans, 29 U.S.C. § 1001(b), ERISA contains detailed and stringent funding requirements for defined benefit pension plans designed to ensure that such plans will have sufficient assets to pay the promised benefits to participants when they retire. 29 U.S.C. § 1082. Ensuring adequate funding of pension plans was "one of the principal congressional concerns motivating the passage of the Act." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 580 (1985). The sponsoring employer or employers are responsible for making the required contributions. 29 U.S.C. § 1082(b)(1); *see Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 440 (1999) (noting "the employer's obligation to make up any shortfall"). Under ERISA, "an employer is required to contribute to a plan whenever the plan's liabilities exceed its assets." *Perelman v. Perelman*, 793 F.3d 368, 374 (3d Cir. 2015). Where employers fail to make the necessary contributions to adequately fund a pension plan, a court may order that the employers make the contributions necessary to fund the plan. *See, e.g., L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 634 F. Supp.

2d 290, 312 (E.D.N.Y. 2009), *aff'd*, *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 710 F.3d 57, 69 (2d Cir. 2013).

It is well established that one of the important duties "ERISA imposes upon fiduciaries is to take action to ensure that 'a plan receives all funds to which it is entitled.'" *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 832–33 (6th Cir. 2007) (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 571 (1985)). A fiduciary can be designated pursuant to plan procedures and those named fiduciaries often include the plan "administrator," a person or group of persons empowered to administer the plan. *See* 29 U.S.C. § 1102(c)(1) and 29 U.S.C. § 1002(16). These fiduciaries are charged with the responsibility for meeting ERISA's many reporting and disclosure duties. *See, e.g.*, 29 U.S.C. §§ 1021–25.

If no plan administrator is named in the plan document, then the administrator is the plan "sponsor." 29 U.S.C. § 1002(16)(A)(ii). Also, "ERISA clearly assumes that trustees . . . will take steps to identify all participants and beneficiaries, so that the trustees can make them aware of their status and rights under the trust's terms." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 571–72 (1985). Where an employer fails to keep adequate records, an "'employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [the Act] …of the Act." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946) (involving Fair Labor Standards Act); *see also* *Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 697 (6th Cir. 1994) (finding an employer should not be allowed to benefit

31

from the violation of its statutory record-keeping duty under ERISA); *Brick Masons Pension Tr. v. Indus. Fence & Supply, Inc.*, 839 F.2d 1333, 1338 (9th Cir. 1988) (same).

The broad relief provided in ERISA Section 502(a)(3) includes an order "to enjoin any act or practice which violates any provision of this title or the terms of the plan" or "other appropriate equitable relief . . . to redress such violations or . . . to enforce the terms of ERISA or the plan." 29 U.S.C. § 1132(a)(3); *see CIGNA Corp. v. Amara*, 563 U.S. 421, 443 (2011) (recognizing that an equitable claim for surcharge, reformation, or estoppel may be permitted in some situations based upon an ERISA fiduciary's breach of a duty towards a covered employee); *see Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 722 (8th Cir. 2014) (recognizing the Supreme Court's decision in *Amara* changed the legal landscape by clearly spelling out the possibility of an equitable remedy under ERISA for breaches of fiduciary obligations by plan administrators). Equitable relief under § 1132(a)(3)(B) "'is limited to those categories of relief that were *typically* available in equity' during the days of the divided bench (meaning, the period before 1938 when courts of law and equity were separate)." *Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 142 (2016) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993)).  "Trust law provides for broad and flexible equitable remedies in cases involving breaches of fiduciary duty.  In addition to specific remedies for recovery of profits obtained by fiduciaries by use of plan assets, trust law provides the alternative remedy of restoring plan participants to the position in which they would have occupied but for the breach of trust.*" Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir. 1978).

A federal court enforcing fiduciary obligations is "thus given broad equitable powers to implement its remedial decrees." *Delgrosso v. Spang & Co.*, 769 F.2d 928,

937 (3d Cir. 1985). Section 409 of ERISA subjects plan administrators who breach their obligations to "such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1109(a). "[T]the court has a duty to enforce the remedy which is most advantageous to the participants and most conducive to effectuating the purposes of the trust." *Id.*; *see also Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) (finding ERISA requires a breaching fiduciary to restore a plan to the position it would have been in but for that fiduciary's unlawful conduct). A court may order surcharge against defendants in the amount of the underfunding on the basis they are jointly and severally liable for the fiduciary breaches. *See Perez v. Kwasny*, 159 F. Supp. 3d 565, 575 (E.D. Pa. 2016); *Struble v. New Jersey Brewery Emps. Welfare Tr. Fund*, 732 F.2d 325, 332 (3d Cir. 1984) (stating that "it is a well-established principle of trust law that multiple trustees who are at fault may be held jointly and severally liable.").

"Removal and replacement of a [plan] administrator under ERISA has been found appropriate where the administrator has been in substantial violation of his fiduciary duties," such as substantial failures to follow ERISA or plan terms. *Delgrosso*, 769 F.2d at 937.

### B.  Discussion

The findings set forth in the Court's earlier orders are incorporated herein. D.I. 132, D.I. 176, D.I. 327, D.I. 442, D.I. 452, and D.I. 457. Those findings are the law of the case and are dispositive of several of the defendants' arguments.

As noted in the earlier orders, the trust/plan at issue is covered by ERISA. D.I. 132, Memorandum and Order at 14. The plaintiff has Article III standing to pursue her claims. D.I. 442, Memorandum and Order at 13. The Court has rejected the argument

that there is no interstate commerce nexus.  D.I. 132, Memorandum and Order at 12.
There is no reason to revisit the issue.  The evidence at trial confirms the Court's earlier
finding that the qualified employers are engaged in interstate commerce.  The record
shows that several employees performed work in states other than Delaware and the
business ventures pursued by the qualified employers affected commerce generally.
Hiring domestic help affects interstate commerce especially when the employees covered
by the trust instrument are spread all over the country.

Also, the Court has earlier disposed of the argument that there are no direct claims
against the third-party defendants.  D.I. 442, Memorandum and Order at 8.  As this Court
has earlier pointed out, "[t]he gravamen of the complaint is, and always has been,
equitable relief for breach of duty in connection with the administration of an ERISA plan,
no matter how characterized."  D.I. 457, Memorandum and Order at 3.

The Court rejects James Wyeth's argument that he is exempt from funding
obligations 29 U.S.C. § 1081(a)(5), because the trust is "a plan which has not at any time
after the date of enactment of this Act provided for employer contributions."  That provision
"was intended to exempt only those plans that are based solely on employee
contributions").  *Concord Control, Inc. v. Int'l Union, United Auto., Aerospace & Agr.
Implement Workers of Am.*, 647 F.2d 701, 704 (6th Cir. 1981).  Also, the trust did provide
for additions, including in the form of contributions from the Qualified Employers.  *See* T.
Ex. 1, Trust at 11, ¶ 9(g).  There is no evidence or even argument that the qualified
employers would have been precluded from contributing funds to the trust.  The evidence
shows that the trust is a defined benefit plan.  It does not provide for an individual account
for each participant, and it does not segregate accounts per qualified employer.

34

Accordingly, it is a single plan with multiple employers, and not an aggregation of single employer plans.  See *Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan*, 671 F. Supp. 2d 88, 102 (D.D.C. 2009).

A trustee of an ERISA plan is a fiduciary by the very nature of the position and its authority with respect to plan assets.  The evidence establishes that Elton Corp. and First Republic are or were fiduciaries of the plan, and that they were bestowed with broad powers as trustees.  The trust document gives them expansive authority with respect to plan management and administration.  Elton Corp., as trustee from approximately 1991 until 2015, is a fiduciary under ERISA.  Likewise, First Republic, as the current trustee, is an ERISA fiduciary.

The evidence at trial also supports the conclusion that both the trustees and the qualified employers are plan administrators.  The trust does not expressly name a plan administrator.  The evidence shows that Elton Corp. and First Republic have exercised discretionary authority or control over the management or disposition of the trust and its assets and has discretionary authority and/or responsibility in the administration of the trust.  The trustees interpreted the trust and made decisions on eligibility.  They exercised discretionary control and authority over nearly all aspects of plan administration, including calculating the benefits and making payments from the trust.  The evidence shows they were performing the functions that are typically those of a plan administrator.

The parties stipulate that the qualified employers are plan sponsors.  Because they are employers under ERISA, they are plan sponsors by operation of law.  The qualified employers, as plan sponsors, are plan administrators by default since the trust does not name a plan administrator.  Also, they functioned as administrators in that, over the

course of several decades, the qualified employers participated in decisions about the trust to varying degrees, including making investment decisions and recommendations, and weighing in on who would be the successor trustee. They received annual reports from the trustee and met with and corresponded between themselves (and Elton Corp.) about the funding problem. Most importantly, the qualified employers had the power to decide who would get a pension. The qualified employers could hand-pick the employees that would be provided pension benefits. The Court finds that the qualified employers are both plan sponsors and plan administrators who exercised discretion with respect to the plan's administration and management. Thus, the grandchildren/qualified employers are fiduciaries under ERISA.

The Court agrees with the plaintiff that the trustees and qualified employers have breached fiduciary duties. They have failed to comply with the funding, vesting, notice and other requirements of ERISA. The Court finds that all the trustees and qualified employers are liable for the underfunding of the trust. The trustees are also liable for failing to provide proper notices to the potential beneficiaries.

The evidence shows that Elton Corp. was aware of the massive underfunding of the trust and chose to do nothing to fix the underfunding problem over the course of many years despite having been presented with several alternatives to remediate the problem. Bringing the trust into compliance with ERISA would have been in the best interests of the plan participants and beneficiaries, for example by ensuring that all participants and beneficiaries received benefits to which they were entitled; putting participants and beneficiaries on notice of their rights under the plan; and ensuring that the plan was adequately funded. The trustees also have breached their fiduciary duties by failing to

tax qualify the trust, thereby causing it to unnecessarily pay federal and state income tax from trust assets.

There is evidence from which the Court can infer that First Republic turned a blind eye to its responsibilities as a fiduciary. The fact that the trustees—both Elton Corp. and First Republic—sought to obtain indemnification agreements demonstrates that they were looking out for their own interests by limiting their own exposure, instead of acting "with an eye single to the interests of the participants and beneficiaries," as is required by ERISA's duty of loyalty. *See Donovan,* 680 F.2d at 271. The fact that they sought indemnification is evidence of their knowledge of potential problems related to ERISA coverage. The record shows that Elton Corp. would have been aware, by virtue of legal opinions dating back to the 1970s and 1980s that there was at least some question about ERISA coverage.

Before accepting the role of successor trustee, First Republic handpicked a law firm for the stated purpose of providing an opinion that ERISA did not govern the trust. The opinion was equivocal and thin. Also, the record indicates that First Republic had a legal department, but apparently did not have the legal department review the opinion. First Republic made no inquiry as to whether or not the potentially eligible employees fit within the category— "limited to services within domestic residences" that would take the trust outside the purview of ERISA according to the Mand Marblestone opinion. *See* T. Ex. 131. The evidence suggests the many employees would likely not fit within that definition. The trust covered, and the qualified employers employed, many more types of employees than household workers (attorneys, accountants, secretaries and assistants, for example). Although Fields testified that Elton Corp. took the position that employees

of for-profit entities would not be eligible under the trust, that rule did not appear to be strictly adhered to.

Although the parties stipulated that First Republic had no knowledge of the Wagner group November 2015 opinion that ERISA did apply to the trust prior to becoming trustee in august 2015, the evidence shows that it would have been aware of the Wagner Law Group opinion that conflicted with the Mand Marblestone opinion shortly thereafter because they were copied in on correspondence.  First Republic and still did nothing to remedy the situation, in spite of testimony that it would not have accepted the trustee position if it had been aware that the trust was an ERISA-covered trust, it did nothing once it became aware of facts-including this court's opinion—that the trust is an ERISA plan. Both Elton Corp. and First Republic have long been aware of potential exposure to ERISA liability.  Elton was aware that the trust lacked funds to cover its potential obligations and First Republic would surely have been aware of the underfunding if it made any inquiry as to the potential beneficiaries of the trust.   Nonetheless, both have chosen to do nothing to fix the underfunding problem.  Both Elton Corp. and First Republic chose not to pursue options that would have either conclusively determined that the trust was not an ERISA-covered plan or reformed the trust to come into compliance with ERISA.  They could also have terminated the trust and purchased annuities to cover the pensioners or contributed to the trust to cover the shortfall.  The trustees and qualified employers made calculated decisions not to pursue those alternatives at their own peril.  The trustees and qualified employers breached their duties to ensure the plan was adequately funded.

The record shows that each of these qualified employers had or have employees who are receiving pensions, have been chosen to receive a pension in the future, or are

entitled to receive pensions now or in the future.[7]  The Court credits the testimony of the plaintiff's expert Noor Rajah.  He testified that the present estimated liabilities of the Pension plan are $38 million, while its assets are only $2.7 million.  Rajah's testimony is uncontroverted.  He testified that his calculations are transparent, can be reproduced by any qualified actuary, and can form the basis for ongoing plan administration.  The Court finds Rajah's conclusions are based on actuarial science and are reliable.  Rajah's report and conclusions can be used as a starting point to independent fiduciary.

The Court finds that all of the employees who were paid by a qualified employer or paid through an entity owned by a qualified employer and who provided services as defined in the trust are eligible for benefits under the terms of the trust and are subject to ERISA's vesting requirements.[8]

The Court credits Noor Rajah's testimony that the plan is underfunded by up to 38 million dollars.  The Court finds Rajah is well qualified to determine funding liability of a defined benefit pension plan.  The defendant's criticism of Rajah's opinion as being based on incomplete data was a problem created by the qualified employers over many decades by their own failure to keep complete records of their employees; and was perpetuated by the trustees' failure to bring the trust into compliance with ERISA, including ERISA's

---

[7] The plaintiff has established that the plan today lacks sufficient assets to pay the benefits it currently owes to vested participants over age 65.  When it places in pay status all the participants who are currently entitled to receive pensions, as it must do to comply with ERISA, it will immediately exhaust all its current assets, leaving pensioners in their 70s and 80s without pension benefits and leaving participants under age 65 without hope of ever receiving pensions.

[8] This would include but is not limited to the employees of Elton Corp., B-103 Corp., any B-103 employees who worked with Fields providing services for the duPont family before B-103 was formed, employees of Chadds Ford Stables, LLC, any of Phyllis Wyeth's employees before Chadds Ford Stables was established, employees of Hickory Tree Farm, Inc. and Hickory House Farm, domestic and other household employees of Abel-Smith performing services such as butler, cook, farm manager, groom, house manager, housekeeper, caregiver, and secretary, and employees of Abel-Smith's mother.  Though Christopher du Pont contends he never had any employees, he is one of the owners of Elton Corp. and is liable through that entity.

recordkeeping requirements.  The Court finds the database Rajah built can be used as a base for future plan administration by an appointed independent fiduciary to finally administer the plan in accordance with ERISA.

The remedy in this case is in the nature of a surcharge under the Court's equitable powers.  In awarding appropriate relief, the Court finds it should order the removal of First Republic as trustee of the plan once the Court appoints a qualified trustee.  The Court will also appoint a special master to aid in affording relief and administering the ERISA plan.  Should any of the qualified employers, as plan sponsors, decide that they would prefer to terminate the plan, an Independent Fiduciary could engage in this multi-step process to ensure compliance with ERISA and the DOL regulations.  *See* 29 C.F.R. §§ 4041.21–4041.31.

IT IS ORDERED:

1. Defendant Gregory Fields is dismissed as a party defendant but does not qualify as a qualified employee due to the retirement arrangement previously provided by a President of the Elton Corporation.

2. Third-party defendant James B. Wyeth's motion for judgment as a matter of law, D.I. 465, is denied.

3. Third-party defendant James Mills's motion for judgment, D.I. 468, is denied.

4. In consultation with the parties, the Court will appoint a Special Master to:

   a. Oversee retaining an ERISA trustee, for distribution and dissolution of the trust.

   b. identify and notify potentially current and past qualifying employees who have not been provided for by the Trust or in lieu of the Trust;

   c. calculate an adequate funding figure to be prorated by the expense for each qualified pensioner per qualified employers; and

   d. shall accomplish all this within one calendar year from the date of this order being final.

5.      The Special Master is to be paid by the trustee, First Republic Trust Company with an initial advance to be to be paid in trust to the Clerk of the District Court for the District of Delaware from which the Special Master shall apply to the Court for interim billing.

6.      Third-party plaintiff First Republic Trust Company will be discharged as trustee when a qualified trustee is appointed by the court.

7.      Except as provided herein the defendants and third-party defendants are jointly and severally liable for the underfunding of the plan, in an amount to be later determined.

8.      Any deceased qualified employers who can demonstrate having no currently eligible qualified employees will be dismissed with no liability.

9.      All qualified employers who do not have employees currently receiving pensions may opt out, and avoid joint and several liability, by establishing a qualified ERISA plan for their past, present and future employees which is of equal or greater value to that provided by the duPont trust.

10.     The remaining qualified employers must adequately fund the trust consistent with ERISA regulation and the qualifying provisions of the trust. Adequate funding shall mean sufficient funding to provide benefits equal to or greater than the provisions of the duPont trust for all qualified employees for their lifetimes.

11.     The remaining qualified employers must annually provide the trustee updated employment records of any qualified employee.

12.     All previously qualified employees regardless of their prior duties shall retain pension benefits.

13.     In the event the trust is not dissolved, future qualified employees must meet the definitions outlined in the trust and shall not include employees of any corporate entities affiliated with the qualified employers, for profit or otherwise, unless said employee qualifies as at least a 5-year personal employee of a qualified employer.

Dated this 25th day of January 2022.

                                        BY THE COURT:

                                        s/ Joseph F. Bataillon_____
                                        Senior United States District Judge